[Cite as *State v. Stephens*, 2013-Ohio-2223.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No. 26516 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| CHAD STEPHENS | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No. CR 11 09 2456 |

DECISION AND JOURNAL ENTRY

Dated: May 29, 2013

---

WHITMORE, Judge.

{¶1} Defendant-Appellant, Chad Stephens, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I

{¶2} This case arose after two unrelated individuals, Matthew Thomas and Kim Slayko, were victimized when they attempted to arrange a drug buy between themselves and a man who called himself "Mo." On August 23, 2011, Thomas was robbed at gun point by an unknown assailant after speaking with Mo on the phone and arriving at the location where Mo told him to go. On August 31, 2011, Slayko was murdered nearby that same location after speaking with Mo on the phone, meeting with him, and walking up a driveway with him. The Akron Police Department later linked the investigations after the name Mo and the same cell phone number surfaced in both cases. There was testimony at Stephens' trial that his nickname

was Mo and that the cell phone number used to contact both Thomas and Slayko belonged to him.

{¶3} A grand jury indicted Stephens on ten counts and multiple firearm specifications. The State dismissed four counts before trial and presented the remaining six counts to the jury. The following two counts arose from the events that took place on or about August 23rd: (1) having weapons while under disability, in violation of R.C. 2923.13(A)(2); and (2) complicity to commit aggravated robbery, in violation of R.C. 2911.01(A)(1). Meanwhile, the following four counts arose from the events that took place on or about August 31st: (1) complicity to commit aggravated robbery, in violation of R.C. 2911.01(A)(1); (2) complicity to commit felony murder, in violation of R.C. 2903.02(B); (3) complicity to commit murder, in violation of R.C. 2903.02(A); and (4) having weapons while under disability, in violation of R.C. 2923.13(A)(2). The four complicity charges all contained attendant firearm specifications pursuant to R.C. 2941.145.

{¶4} The jury found Stephens guilty of both counts of complicity to commit aggravated robbery and of complicity to commit felony murder, in violation of R.C. 2903.02(B). The jury found him not guilty, however, of all of the firearm specifications attached to those counts. The jury also found Stephens not guilty of the remaining three charges. The trial court merged the complicity to commit aggravated robbery count from August 31st into the murder count from that same day and sentenced Stephens to 15 years to life on the murder count. The court also sentenced him to eight years on the other complicity to commit aggravated robbery count and ordered the sentences to run consecutively for a total sentence of 23 years to life in prison.

{¶5} Stephens now appeals and raises four assignments of error for our review. For ease of analysis, we combine several of the assignments of error.

II

<u>Assignment of Error Number One</u>

THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT HIS STATUTORY AND CONSTITUTIONAL RIGHT TO SPEEDY TRIAL GUARANTEED BY THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION, WHEN HIS TRIAL WAS NOT HELD WITHIN THE STATUTORY TIME PERIOD PROVIDED BY OHIO REVISED CODE 2945.71.

<u>Assignment of Error Number Two</u>

APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN TRIAL COUNSEL FAILED TO RAISE THE ISSUE OF THE TRIAL COURT'S DENIAL OF APPELLANT'S CONSTITUTIONAL RIGHT TO SPEEDY TRIAL.

**{¶6}** In his first assignment of error, Stephens argues that the court erred by trying him in violation of his speedy trial rights. In his second assignment of error, Stephens argues that he received ineffective assistance of trial counsel because his counsel never sought to dismiss his case due to a speedy trial violation. We disagree with both propositions.

**{¶7}** "The right of an accused to a speedy trial is recognized by the Constitutions of both the United States and the state of Ohio." *State v. Pachay*, 64 Ohio St.2d 218, 219 (1980). Ohio's speedy trial statute provides that a person charged with a felony must be brought to trial within 270 days of his arrest. R.C. 2945.71(C)(2). Yet, "each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(E). Accordingly, if a person charged with a felony remains in jail in lieu of posting bond, that person must be brought to trial within 90 days of his arrest. *Id.* "Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised

Code." R.C. 2945.73(B). Under certain conditions, however, the time within which an accused must be brought to trial can be tolled. *State v. Dalton*, 9th Dist. No. 09CA009589, 2009-Ohio-6910, ¶ 21. Speedy trial time can be tolled for "[a]ny period of delay necessitated by reason of a * * * motion, proceeding, or action made or instituted by the accused." R.C. 2945.72(E).

{¶8} Stephens was arrested on September 6, 2011, so his speedy trial time began to run on September 7, 2011. *See State v. Browand*, 9th Dist. No. 06CA009053, 2007-Ohio-4342, ¶ 12 ("Time is calculated to run the day after the date of arrest."). Stephens remained in jail after he was arrested. Therefore, he argues that R.C. 2945.71's triple-count provision initially applied to him. *See* R.C. 2945.71(E). Stephens acknowledges that, on January 26, 2012, the trial court discovered he was subject to a holder in another county. He further acknowledges that, as discussed below, an accused is not entitled to R.C. 2945.71's triple-count provision if he is simultaneously being held on other charges. Stephens' argument is that, because his speedy trial time expired before the court discovered his holder, his case should have been dismissed. For purposes of disposing of Stephens' argument, we initially analyze his speedy trial time using R.C. 2945.71's triple-count provision.

{¶9} On September 26, 2011, Stephens filed a demand for discovery, a tolling event for purposes of the speedy trial statute. *See* R.C. 2945.72(E); *State v. Miller*, 9th Dist. Nos. 10CA009922 & 10CA009915, 2012-Ohio-1263, ¶ 10. The trial court held a second pretrial on October 12, 2011, at which the State notified the court that it had provided Stephens with discovery. Stephens does not dispute that the State complied with his demand for discovery on October 12, 2011, or that his speedy trial time was tolled from September 26, 2011, until October 12, 2011. From September 7th (the day after Stephens' arrest) until September 26th (the day he

demanded discovery), therefore, 60 days elapsed for purposes of Stephens' speedy trial time. The speedy trial clock did not resume until October 12th.

{¶10} On November 18, 2011, Stephens filed a motion to sever, thereby tolling his speedy trial time. *See* R.C. 2945.72(E); *State v. Yauger*, 9th Dist. No. 16143, 1993 WL 430508, *2 (Oct. 27, 1993). From October 12th to November 18th, 111 days elapsed for purposes of speedy trial time, bringing the total elapsed time to 171 days (60 days + 111 days). The court denied Stephens' motion to sever on November 29, 2011, but Stephens filed a motion to suppress that same day. "[A] motion to suppress tolls the speedy trial clock from the time the defendant files the motion until the trial court disposes of the motion, as long as the trial court's disposition occurs within a reasonable time." *State v. Kolvek*, 9th Dist. No. 21808, 2004-Ohio-2515, ¶ 7. The court held a hearing and later denied Stephens' motion to suppress on December 29, 2011. Stephens has not argued that the court failed to dispose of his motion within a reasonable time. Thus, speedy trial time was effectively tolled from November 18th until December 29th.

{¶11} On January 26, 2012, the trial court held a hearing on a motion to continue filed by the State. At that point, an additional 84 days had elapsed for purposes of speedy trial time, bringing the total elapsed time to 255 days (84 days + 171 days). Stephens is, therefore, incorrect that his speedy trial time had already elapsed by January 26, 2012. Even giving Stephens the benefit of R.C. 2945.71's triple-count provision up to that point, only 255 days of 270 days had elapsed. Therefore, a dismissal for a speedy trial violation would not have been appropriate at that point in time.

{¶12} At the January 26th hearing, the trial judge advised Stephens that her bailiff had uncovered a "heroin trafficking F3 holder," out of Stark County, as well as a possible holder for

a robbery charge. Stephens denied the holder on the robbery charge, but admitted to the trafficking holder. R.C. 2945.71's triple-count provision only applies if an accused is being held in jail *solely* on the pending charge. *State v. Skorvanek*, 9th Dist. No. 08CA009399, 2009-Ohio-3924, ¶ 11, citing *State v. MacDonald*, 48 Ohio St.2d 66 (1976), paragraph one of the syllabus. If the accused is also being held in jail on other charges, the triple-count provision is inapplicable. *MacDonald* at 71-72. Instead, the 270-day time limit contained in R.C. 2945.71(C)(2) applies. *State v. Richter*, 9th Dist. No. 11799, 1985 WL 10977, *2 (Feb. 13, 1985). *See also MacDonald* at 71. Because Stephens was subject to a holder on an unrelated case in Stark County, he was not entitled to R.C. 2945.71's triple-count provision. The State only had to bring him to trial within 270 days.

{¶13} Stephens suggests in his brief that this Court should calculate his speedy trial time using both R.C. 2945.71(E) and 2945.71(C)(2). That is, he suggests that we should apply the statute's (1) triple-count provision to the period of time encompassing his arrest date until January 26, 2012, the date when the court discovered his holder, and (2) the 270-day count provision from that point forward. Stephens cites no authority in support of that position. The Ohio Supreme Court has held that the triple-count provision does not apply when an accused is subject to a holder on a different case. *State v. Brown*, 64 Ohio St.3d 476, 479-480 (1992); *MacDonald* at paragraphs one and two of the syllabus. If an accused is only subject to a holder for part of the time period between his arrest and trial date, then the date(s) on which the holder was placed and/or terminated become(s) relevant. *See, e.g., State v. Friedhof*, 9th Dist. No. 2505-M, 1996 WL 385612, *3 (July 10, 1996) (defendant only entitled to one day of triple-count credit when a probation violation holder was placed on him the following day). The applicability of the triple-count provision does not, however, depend upon the date the holder is discovered.

{¶14} "In the absence of a copy of a [] holder, or filed findings of fact and a judgment entry memorializing a ruling regarding a [] holder, the transcript of proceedings may provide sufficient evidence of the existence of such holder." *State v. Ballow*, 9th Dist. No. 2527-M, 1996 WL 365020, \*2 (July 3, 1996). At the January 26, 2012 hearing, the trial court informed Stephens that he was subject to a holder in Stark County and that "[t]he 270 days applies when \* \* \* you are being held in the jail on another matter." Stephens agreed that he had a trafficking charge in Stark County. He never contested, either at the trial court-level or on appeal, the existence of the holder or its duration. "Any question regarding the existence of the [] holder should have been raised in the trial court." *Brown* at 481. Because Stephens never challenged the existence or duration of the holder for his trafficking charge, we must conclude that the holder was in place throughout the relevant time period here. Therefore, we conclude that the 270-day count provision applied to Stephens from the day after his arrest until the day of his trial.

{¶15} As previously set forth, Stephens was arrested on September 6, 2011, so his speedy trial time began to run on September 7, 2011. His trial commenced on May 7, 2012, 243 days later. Because Stephens was brought to trial within 270 days, his speedy trial rights were not violated. Therefore, the trial court did not err by trying him, and his trial counsel was not ineffective for failing to seek a dismissal. Stephens' first and second assignments of error are overruled.

Assignment of Error Number Three

THE TRIAL COURT ERRED BY DENYING APPELLANT'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL AS THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN THE CONVICTIONS.

{¶16} In his third assignment of error, Stephens argues that the trial court erred by denying his Crim.R. 29 motion because his convictions are based on insufficient evidence. We disagree.

{¶17} "We review a denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence." *State v. Slevin*, 9th Dist. No. 25956, 2012-Ohio-2043, ¶ 15. In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

{¶18} As a result of certain events that occurred on August 23, 2011, Stephens was convicted of complicity to commit aggravated robbery. The aggravated robbery statute provides, in relevant part:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *.

R.C. 2911.01(A)(1). "R.C. 2923.03(A)(2) prohibits any person 'acting with the kind of culpability required for the commission of an offense' from aiding or abetting another in committing the offense." *State v. Smith*, 9th Dist. No. 25650, 2012-Ohio-794, ¶ 7, quoting R.C.

2923.03(A)(2). The phrase "aid or abet" means that a defendant "supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that [he] shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240 (2001), syllabus. "The criminal intent of the aider and abettor 'can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed.'" *Smith* at ¶ 7, quoting *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, ¶ 13. A person guilty of complicity "shall be prosecuted and punished as if he were a principal offender." R.C. 2923.03(F).

{¶19} As a result of certain events that occurred on August 31, 2011, Stephens was convicted of complicity to commit aggravated robbery, as previously defined, and complicity to commit felony murder. The felony murder statute provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). Aggravated robbery, the predicate offense for Stephens' felony murder charge, is a first-degree felony. R.C. 2911.01(C).

**The August 23, 2011 Incident**

{¶20} Matthew Thomas testified that he first met Stephens at a gas station in Akron sometime around August 14, 2011. On that day, Stephens approached Thomas and the two ultimately exchanged cell phone numbers. Thomas admitted that he was addicted to prescription pain pills, including Opana, and that he and Stephens had agreed to meet in the future so that Stephens could sell him prescription pills. According to Thomas, Stephens introduced himself as "Mo" and never used his real name. Thomas later identified Stephens at trial as the man he knew to be Mo.

{¶21} Three days after their initial meeting, Stephens called Thomas to sell him pills and Thomas agreed to meet him. According to Thomas, he was "all over the place" on their meeting day because Stephens "kept [giving him] the run-around." Moreover, while the two had agreed Thomas would purchase 30-40 Opana pills of a specific dosage from Stephens, Thomas testified that Stephens only had about 12 pills of a lesser dosage with him when the two finally met. Thomas stated that Stephens was "uneasy" during their meeting and kept walking back and forth from his car to Stephens. Because Stephens had not brought the right pills with him, Thomas testified that he only bought a few pills and left.

{¶22} Three days later, Stephens contacted Thomas to arrange another sale. Again, Thomas testified that Stephens gave him "the run-around" for about two hours. Thomas explained that Stephens would call him and direct him to a location, but when Thomas arrived, Stephens would not be there. At the last location, Stephens would not answer his cell phone, so Thomas returned home. The next day, Stephens called again and told Thomas that he had not shown up because "he was just worried that [Thomas] might have been a cop." The two agreed to meet again so that Thomas could purchase $700 worth of Opana pills from Stephens.

{¶23} On August 23, 2011, Thomas testified that he left work in the afternoon and dropped off his brother because Stephens had told him to come to their meeting alone. Thomas then drove to Briarwood Drive in Akron; the location Stephens had selected for their meeting. He observed another man walk past his car several times while he waited for Stephens, but Stephens never appeared. After approximately half an hour, Thomas decided to leave and began to drive off. Stephens then called his cell phone and asked where he was going. Stephens instructed Thomas to take a left onto the next street because "he would be pulling up." When Thomas did so, however, he was instead approached by the man he had seen walk past his car

several times while waiting for Stephens. The man introduced himself as Stephens' brother and told Thomas that he would take him over to Beechwood Drive where the two would meet with Stephens. Thomas agreed, let the man in his car, and drove to Beechwood Drive. Once there, the man led Thomas on foot to a house and ultimately robbed him at gun point. Thomas called Stephens on his cell phone several times after the robbery, but Stephens never answered.

{¶24} About two weeks after the robbery, Thomas testified that he was arrested for possession and taken to the Summit County Jail. Thomas was placed in the same holding cell as Stephens and the two spoke. According to Thomas, Stephens denied playing any part in the robbery and said that someone had stolen his cell phone. Thomas gave Stephens' cell phone number to the police when he reported the robbery that had occurred and also identified the number at trial.

{¶25} Detective Frank Harrah testified that he interviewed Thomas a few days after he reported the robbery. Thomas told Detective Harrah that he had planned to purchase drugs from a man named Mo, but that he had been robbed by someone claiming to be Mo's brother. Thomas gave Detective Harrah the cell phone number of the man whom he knew as Mo. After speaking with another officer, Detective Harrah testified that he was able to link the cell phone number and the name Mo to an ongoing homicide investigation.

**The August 31, 2011 Incident**

{¶26} Michael Tudhope testified that his friend, Kim Slayko, stayed with him on the night of August 30, 2011, because Slayko had just left a rehabilitation center and needed a place to stay. Tudhope testified that both he and Slayko were addicted to drugs and that they both abused prescription pills on the night of Slayko's stay. Close to 3:00 a.m. on August 31st, Tudhope and Slayko walked to a nearby Walgreens to buy some snacks. They struck up a

conversation with two men while they were there, one of whom introduced himself as "Mo." Tudhope testified that he programmed Mo's cell phone number into his cell phone, but Slayko could not do so because he did not have his cell phone with him. Slayko later told Tudhope that he had gotten Mo's number and showed him a small piece of paper with the number written on it.

{¶27} Harold Long testified that, during the early morning hours of August 31st, he was employed as an overnight clerk for Walgreens. Long testified that a man came to his cash register and asked for a piece of paper and a pen so that he could write down his phone number for someone. Long supplied the man with both items and watched the man write down a phone number on the small piece of paper. Long identified Stephens at trial as the man who approached his register and wrote down his cell phone number. Recorded footage from Walgreens' security cameras also showed the man Long identified as Stephens at the store shortly after 3:00 a.m.

{¶28} Traci Slayko, Kim Slayko's wife, testified that she was with her husband on August 31st when he got a phone call from a man he said he had met the previous night at Walgreens. Slayko told his wife the man's name was Mo, and Traci understood that Slayko meant to meet with Mo in order to purchase drugs from him. Traci testified that she went with Slayko when he left to meet Mo at a place of Mo's choosing. Traci stated that she was not certain exactly where they drove, but that it was somewhere in west Akron. When the two arrived at the location, no one was there to meet them. Slayko then called Mo's cell phone number and spoke with him before he and Traci drove to a second location. Once again, Traci testified that she was not familiar with the area, but that it was a residential neighborhood in west Akron. Slayko exited the vehicle at the second location while Traci remained in the car. Traci

testified that her husband ran back to the vehicle a few minutes later, limping and bleeding from his leg. Slayko informed Traci that he had run away from two men who had tried to "jump[]" him and that he had fallen down while running. The two started to leave the area because Slayko wanted to go to the hospital.

{¶29} Traci testified that she and Slayko were en route to the hospital when Slayko's cell phone rang. It was Traci's impression that the phone call Slayko received was from Mo and, as a result of the call, the two drove to 900 Baughman Street. Traci testified that Slayko had $278 on him when they arrived on Baughman Street, but that she made Slayko give her the money. After Slayko parked their vehicle at the driveway of 900 Baughman Street, a man approached their car. Traci stated that Slayko greeted the man and called him Mo. Slayko then gave the man a pocket knife as a "peace offering" to show him that he was not a police officer. According to Traci, the person with whom Slayko had spoken on the phone several times that day had expressed his concern that Slayko might be a police officer, so Slayko felt the need to prove he was not. Traci then watched as Slayko and the man walked up the driveway and behind the house where Traci lost sight of them. After an unspecified length of time, Traci heard a loud noise come from behind the house. Traci got out of the car and went to the back of the house where she found Slayko lying on the ground with a gunshot wound. Traci testified that she did not see anyone else behind the house. Although Traci called 911 and attempted to perform CPR on her husband, he ultimately succumbed to his wound. Dr. George Sterbenz, the Chief Deputy Medical Examiner for the Summit County Medical Examiner's Office, later testified that Slayko died as the result of a gunshot wound to his right chest. At trial, Traci identified Stephens as the man who her husband had called Mo before walking up the driveway and behind the house with him.

{¶30} Brittany Coleman, Stephens' girlfriend, testified that she was with Stephens after he picked her up from school at about 4:30 p.m. on August 31st. Coleman drove the car once Stephens picked her up, and Stephens asked her to drive to Baughman Street. Once they arrived on Baughman Street, Coleman parked the car and Stephens walked over to a group of people who were standing nearby. He and another man then walked up the street to one of the houses and went up a driveway together. According to Coleman, she lost sight of both men for a moment, but then Stephens walked back down the driveway by himself. By that time, Coleman testified, a vehicle had pulled up to the end of the driveway and Stephens walked out to meet it. Coleman stated that she saw Stephens give something to a man in the vehicle. Stephens then walked back to her car, and the two began to drive away together.

{¶31} Coleman testified that she started to drive up the street, but a man in the street put his hand up and Stephens told her to stop. Coleman recognized the man as the same man who had walked up a driveway with Stephens a short while beforehand. Once the man got into the car, Stephens instructed Coleman to take the man to an apartment complex off of Romig Road. Coleman verified that Stephens told her where to drive the man without the man having spoken to either of them. Coleman testified that Stephens and the man whispered to one another during the drive. At one point, Coleman was able to hear the man tell Stephens that he "didn't get any money."

{¶32} At trial, Coleman agreed that Stephens' nickname was "Mody" and identified the cell phone number that Slayko had used to contact Mo as belonging to Stephens. Coleman admitted that she had spoken with Stephens almost every day since his arrest and that he had asked her not to come to court to testify against him. She further admitted that Stephens had asked her to tell the police that they had not gone to Baughman Street on August 31st.

{¶33} Detective Richard Morrison interviewed Stephens after the August 31st shooting. He testified that when he interviewed Stephens at the police station Stephens denied being in the Baughman Street area at the time of the shooting. Detective Morrison asked Stephens for his cell phone number and testified that, while Stephens gave him several numbers, none of the numbers matched the cell phone number that he had already linked to Stephens through his investigation. He further testified that the police were never able to recover the cell phone linked to that phone number.

**Complicity to Commit Aggravated Robbery**

{¶34} Stephens argues that his conviction arising out of the aggravated robbery of Matthew Thomas is based on insufficient evidence because there was no evidence that he aided or abetted the unidentified man who robbed Thomas. There was testimony, however, that Stephens led Thomas to the location where an unknown assailant robbed him. Stephens repeatedly sought out Thomas, calling him on multiple occasions and luring him to various locales with the promise of selling him the prescription pills he wanted. The first time, Stephens led Thomas to several different spots before finally meeting with him and selling him a far lesser amount of pills than he had promised. The second time, Stephens again directed Thomas to several different spots and ultimately declined to meet with him, citing his fear that Thomas might be a police officer despite already having sold Thomas pills on the previous occasion. The third time, Stephens' directions resulted in Thomas getting robbed at gun point by a man claiming to be Stephens' brother. The robbery occurred directly after Thomas spoke with Stephens on the phone for the last time. Stephens called Thomas when Thomas began to drive away and specifically asked where he was going; an indication that Stephens could see Thomas. *See Smith*, 2012-Ohio-794, at ¶ 17, quoting *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, at ¶

13 (criminal intent of aider and abettor can be inferred from presence of the defendant before offense is committed). Moreover, the man who robbed Thomas approached him in the exact spot that Stephens told Thomas to wait because he "would be pulling up" momentarily. Stephens, however, never appeared. He also never answered Thomas' phone calls once the robbery occurred. *See Smith* at ¶ 17, quoting *In re T.K.* at ¶ 13 (criminal intent of aider and abettor can be inferred from conduct of the defendant after offense is committed).

{¶35} Because all of Stephens' charges were tried together, there also was evidence at trial about Stephens' involvement in Slayko's murder. The locations where Thomas was robbed (Beechwood Drive) and where Slayko was murdered (Baughman Street) were within short walking distance of one another. Further, in both instances, Stephens lured the men to a particular location before unknown assailants robbed them. Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved that Stephens "supported, assisted, encouraged, cooperated with, advised, or incited" an unknown assailant in robbing Thomas and that Stephens shared the assailant's criminal intent. *Johnson*, 93 Ohio St.3d at syllabus. Stephens' argument that his conviction for complicity to commit aggravated robbery is based on insufficient evidence lacks merit.

**Complicity to Commit Aggravated Robbery and Felony Murder**

{¶36} Stephens argues that his complicity convictions arising from the aggravated robbery and murder of Slayko are based on insufficient evidence because the evidence only showed, at most, that he was nearby when Slayko was attacked. As set forth above, however, there was testimony that Stephens specifically led Slayko to the location where he was robbed and murdered. Traci Slayko identified Stephens in court as the man who approached her and her late husband's vehicle on the day of his murder and walked with her husband up the driveway

where he was shot and killed a brief time later. *See Smith* at ¶ 17, quoting *In re T.K.* at ¶ 13 (criminal intent of aider and abettor can be inferred from presence of the defendant before offense is committed). Moreover, Coleman, Stephens' girlfriend, testified that Stephens had her drive them to Baughman Street around the time of the murder and that she saw him walk up a driveway with another man shortly before another vehicle arrived. That same man then flagged down Coleman's car when she and Stephens drove down the street to leave the area. Coleman testified that Stephens told her to pick up the man and knew where to drive the man without having to ask him. Coleman also testified that Stephens and the man whispered to one another during the ride and she heard the man tell Stephens he "didn't get any money." Traci Slayko testified that her husband gave her all of his money before getting out of their vehicle that day. One could infer, therefore, that the man in Coleman's car was the one who attacked Slayko and was speaking to Stephens about the fact that he did not get any money from Slayko. Further, one could infer that Stephens knew what had happened to Slayko, given that he later asked Coleman not to tell the police that they had gone to Baughman Street that day. *See Smith* at ¶ 17, quoting *In re T.K.* at ¶ 13 (criminal intent of aider and abettor can be inferred from conduct of the defendant after offense is committed).

{¶37} As previously discussed, because his charges were tried together, there was also evidence about Stephens' involvement in Thomas' robbery. Considering all of the evidence together, the record supports the conclusion that the State produced evidence which, if believed, showed that Stephens sought out drug addicts for the purpose of luring them to a desired location where another assailant would then rob them. Although the State's evidence was largely circumstantial, circumstantial evidence "inherently possess[es] the same probative value" as direct evidence. *State v. Jones*, 9th Dist. No. 25986, 2012-Ohio-4256, ¶ 9, quoting *Jenks*, 61

Ohio St.3d at paragraph one of the syllabus. Viewing all of the evidence in a light most favorable to the State, a rational trier of fact could have concluded that Stephens "supported, assisted, encouraged, cooperated with, advised, or incited" an unknown assailant in robbing Slayko, that Stephens shared the assailant's criminal intent, and that the commission of the robbery caused Slayko's death. *Johnson*, 93 Ohio St.3d at syllabus. Stephens' argument that his convictions for aggravated robbery and felony murder are based on insufficient evidence lacks merit. His third assignment of error is overruled.

Assignment of Error Number Four

THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶38} In his fourth assignment of error, Stephens argues that his convictions are against the manifest weight of the evidence.

{¶39} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the

exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten*, 33 Ohio App.3d at 340.

{¶40} Stephens combined his sufficiency and manifest weight assignments of error in his appellate brief and has not offered any separate basis for challenging his convictions on the weight of the evidence. This Court has repeatedly held that "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. No. 18349, 1998 WL 224934, *8 (May 6, 1998). Because Stephens has failed to present a separate argument in support of his manifest weight challenge, we decline to engage in an analysis with respect to it. Stephens' argument that his convictions are against the manifest weight of the evidence lacks merit. Stephens' fourth assignment of error is overruled.

III

{¶41} Stephens' assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
BETH WHITMORE
FOR THE COURT

MOORE, P. J.
CONCURS.

BELFANCE, J.
CONCURRING IN JUDGMENT ONLY.

{¶42} I concur in the majority's judgment. Based on the record before us, Mr. Stephens cannot demonstrate on this appeal that his counsel was ineffective for failing to move to dismiss the indictment on speedy-trial grounds. The appellate record does not contain any evidence of when the holder in this case was instituted; thus, it is impossible to know when the triple count provision ceased to apply and whether Mr. Stephens' speedy trial rights were violated at the time of his trial. Accordingly, postconviction relief may be the more appropriate avenue for Mr. Stephens to seek relief. *See State v. Sheppard*, 9th Dist. No. 10CA0041-M, 2011-Ohio-3516, ¶ 8 ("We observe that any evidence supporting her argument that she was prejudiced would likely take the form of affidavits or other evidence that would be outside the record on appeal, making postconviction relief the more appropriate avenue for her to seek relief.").

APPEARANCES:

STEPHANIE YUHAS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.