[Cite as *State v. Brown*, 2021-Ohio-2540.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

v.

LARRY BROWN

    Appellant

C.A. No.     20CA011618

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    16CR094523

DECISION AND JOURNAL ENTRY

Dated: July 26, 2021

CALLAHAN, Judge.

{¶1} Appellant, Larry Brown, appeals his convictions by the Lorain County Court of Common Pleas. This Court affirms.

I.

{¶2} On July 14, 2016, after receiving a report that a man may have been shot in a residence, police officers responded to a home on West 9th Street in Lorain to perform a safety check. The officers found the body of L.S., who had died as a result of a single gunshot wound above his left clavicle. L.S.'s brother, S.F., identified Mr. Brown as the shooter. Mr. Brown fled Ohio and was arrested in Baltimore, Maryland after seeking medical attention for an unrelated injury. He was charged with two counts of murder in violation of R.C. 2903.02(A) and (B), respectively; two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2); and tampering with evidence in violation of R.C. 2921.12(A)(1). The murder and felonious assault

charges were accompanied by firearm specifications pursuant to R.C. 2941.145, and the tampering charge was accompanied by a firearm specification under R.C. 2941.141.

{¶3} Mr. Brown was arraigned on September 29, 2016. On October 7, 2016, Mr. Brown waived his speedy trial rights in writing on a form journal entry, and the first pretrial conference was continued. Numerous such forms appear in the record between that time and November 5, 2018, when the State of Ohio moved to schedule a jury trial. Some of the forms were signed by Mr. Brown; others indicated through counsel that he waived his speedy-trial rights. In response to the State's motion, the trial court set a trial date of March 20, 2019. Five days before the trial date, defense counsel moved to continue the trial, citing counsel's need for an emergency medical procedure. The trial court granted the motion and selected August 19, 2019, as the new trial date. Other pretrial conferences were conducted between counsel in the interim, documented by further form entries that contain the same language regarding waiver of speedy trial. Two were signed by Mr. Brown; a third indicated that Mr. Brown waived his speedy trial rights through counsel.

{¶4} On the date of trial, defense counsel moved to withdraw, and Mr. Brown appeared in court to read a letter addressed to the trial court in which he requested new counsel. The trial was continued, and on August 20, 2019, the trial court granted the motion to withdraw, finding that the relationship between counsel and Mr. Brown had deteriorated to a degree "that they [could] not adequately work together during a trial[,]" and appointed new counsel. The trial court subsequently continued the trial to January 27, 2020, upon request of the defense. On September 12, 2019, however, the State moved the trial court to recuse from the case, arguing that the trial court judge had ex parte contact with a potential witness. The trial court granted the motion.

{¶5} On October 15, 2019, the newly appointed defense counsel also moved to withdraw, citing his own significant health issues. The trial court granted the motion, appointed a

third attorney to represent Mr. Brown, and moved the trial date to January 21, 2020. On December 4, 2019, Mr. Brown filed a motion to dismiss the indictment, alleging that his right to a speedy trial had been violated. The motion was handwritten and signed by Mr. Brown, but his appointed counsel cosigned the motion and the proof of service. The trial court denied the motion, concluding that Mr. Brown had waived his speedy trial rights.

{¶6} A jury found Mr. Brown guilty of all charges and firearm specifications. The trial court merged the murder and felonious assault convictions with their accompanying firearms specifications for purposes of sentencing, and the State elected to proceed to sentencing on the murder conviction under R.C. 2903.02(A). The trial court sentenced Mr. Brown to prison terms of fifteen years to life for the murder conviction and thirty-six months for the accompanying firearm specification. The trial court sentenced Mr. Brown to additional twelve-month prison terms for tampering with evidence and the accompanying firearm specification and ordered each prison term to be served consecutively for an aggregate prison sentence of twenty years to life.

{¶7} Mr. Brown appealed, asserting six assignments of error. His assignments of error are rearranged to facilitate discussion.

**ASSIGNMENT OF ERROR NO. 1**

THE TRIAL COURT ERRED IN DENYING MR. BROWN'S MOTION TO DISMISS IN VIOLATION OF [R.C.] 2945.71 AND [R.C.] 2945.72 AS WELL AS THE UNITED STATES AND STATE OF OHIO CONSTITUTIONS AS MR. BROWN'S RIGHT TO A SPEEDY TRIAL WAS VIOLATED.

{¶8} In his first assignment of error, Mr. Brown argues that the trial court erred by denying his motion to dismiss the indictment because his speedy trial rights had been violated. Specifically, Mr. Brown argues that he did not knowingly, voluntarily, and intelligently waive his right to a speedy trial on some of the dates reflected on the form journal entries in the record and

that the delay in his trial was unreasonable under the circumstances. He also appears to argue that because he was not present for all pretrials, his right to due process was violated.

{¶9} Ohio's speedy trial statute, R.C. 2945.71, provides that an individual who has been charged with a felony must be brought to trial within 270 days of arrest. R.C. 2945.71(C)(2). When a defendant is incarcerated without bail on the pending charge, each day is counted as three days. R.C. 2945.71(E). The rights described in R.C. 2945.71 are coextensive with constitutional speedy trial guarantees. *State v. King*, 70 Ohio St.3d 158, 160 (1994), citing *State v. O'Brien*, 34 Ohio St.3d 7, 9 (1987). Consequently, "an accused's express written waiver of his statutory rights to a speedy trial, made knowingly and voluntarily, also constitutes a waiver of his speedy trial rights guaranteed by the United States and Ohio Constitutions." *King* at 160, citing *O'Brien* at paragraph one of the syllabus.

{¶10} A defendant who has waived speedy trial rights "is not entitled to a discharge for delay in bringing him to trial unless the accused files a formal written objection and demand for trial, following which the state must bring the accused to trial within a reasonable time." *O'Brien* at paragraph two of the syllabus. *See also State v. Bray*, 9th Dist. Lorain No. 03CA008241, 2004-Ohio-1067, ¶ 8. A waiver of speedy trial rights can be of limited or unlimited duration, but when a written waiver fails to specify an expiration date, it constitutes an unlimited waiver. *Bray* at ¶ 8, citing *State v. Kovacek*, 9th Dist. Lorain No. 00CA007713, 2001 WL 577664, *4 (May 30, 2001), citing *O'Brien* at paragraph two of the syllabus. An unlimited waiver is *not* effective only until a defendant's next scheduled court date. *State v. Skorvanek*, 9th Dist. Lorain No. 08CA009399, 2009-Ohio-3924, ¶ 18, citing *State v. Smith*, 9th Dist. Lorain No. 98CA007144, 1999 WL 1260872, *3-4 (Dec. 22, 1999).

{¶11} The foundation of Mr. Brown's arguments is the assumption that he executed multiple speedy trial waivers that were each effective only until the next pretrial date. This proposition is incorrect. On October 7, 2016, Mr. Brown waived his speedy-trial rights in writing on a form journal entry used by the Lorain County Court of Common Pleas to document pretrial proceedings. The waiver did not contain a specific time limitation. This Court has considered the nature of waivers contained on this form on previous occasions, concluding that it operates not as a waiver from one court date to another, but as an unlimited waiver of speedy trial rights. *Skorvanek* at ¶ 17-19; *Smith* at *1, 3-4. Although Mr. Brown expressed dissatisfaction with the fact that he had not been present for all of the pretrial proceedings in his case, he did not demonstrate in support of his motion to dismiss that his unlimited waiver on that occasion was not knowing, voluntary, and intelligent. Consequently, there is no evidence in the record from which this Court could reach that conclusion.

{¶12} There is also no evidence from which this Court could conclude that Mr. Brown formally objected to the delay and demanded a trial. *See O'Brien* at paragraph two of the syllabus; *Bray* at ¶ 8. To the extent that Mr. Brown addresses this matter in his brief, it appears that his argument is that he was unable to do so because he was represented by counsel, with whom he had a disagreement. Mr. Brown's actions in other respects undermine this argument, however: he wrote a letter to the trial court which he read aloud in court upon his first attorney's motion to withdraw, and he authored the motion to dismiss that was ultimately filed. To the extent that he argues that any formal objection would certainly have been rejected by the trial court as an act of hybrid representation, that argument is also not well-taken. *See*, *e.g.*, *State v. Baker*, 7th Dist. Mahoning No. 19 MA 0080, 2020-Ohio-7023, ¶ 103, 105, 108-121 (noting that a pro se motion by a represented defendant who objected to pretrial delay and asserted speedy trial rights was

effective and required consideration of whether the defendant was tried in a reasonable time after the motion was filed).

{¶13} In addition to his arguments related specifically to speedy trial rights, Mr. Brown's first assignment of error appears to assert that he was denied due process because he was not present for pretrial hearings before his first attorney withdrew. The number of pretrial conferences at which Mr. Brown was apparently not in attendance is of concern to this Court, particularly given the fact that the record does not reflect that he waived attendance, through counsel or otherwise. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 103, citing *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 144; *Frazier* at ¶ 145.[1] Nonetheless, the absence of an accused only results in prejudicial error when it prevents "'a fair and just hearing.'" *Frazier* at 139, quoting *Snyder v. Massachusetts*, 291 U.S. 97, 107-108 (1934). "[S]peculative claim[s]" are not sufficient to demonstrate prejudicial error. *See, e.g.*, *Hale* at ¶ 102 (rejecting a defendant's argument that his presence at pretrial conferences would have alerted him to ineffective assistance of trial counsel); *Frazier* at ¶ 142 (noting that a defendant's absence was not prejudicial when the subjects discussed in chambers were "legal or scheduling issues within the professional competence of counsel."). Mr. Brown has not demonstrated that his presence at the pretrials was necessary for a fair and just hearing.

{¶14} Mr. Brown's first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 3

THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING THE STATE
TO RECALL ITS EXPERT WITNESS TO CHANGE HIS TESTIMONY.

---

[1] This Court also notes that although there appears to be no dispute about whether Mr. Brown attended any of the pretrial conferences before his first attorney withdrew, the record does not reflect whether he attended or not. *See generally State v. Clark*, 38 Ohio St.3d 252, 258 (1988).

**{¶15}** Mr. Brown's third assignment of error argues that the trial court abused its discretion by permitting the State to recall R.W., the custodian of records for T-Mobile, to correct a misstatement in his testimony. This Court does not agree.

**{¶16}** Evid.R. 611(A) requires a trial court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." The decision to permit a witness to be recalled falls within the trial court's discretion under Evid.R. 611, and this Court reviews that decision for an abuse of discretion. *See State v. Jackson*, 9th Dist. Lorain No. 14CA010555, 2015-Ohio-2473, ¶ 59, citing *State v. Anderson*, 191 Ohio App.3d 110, 2010-Ohio-6234, ¶ 9 (9th Dist.). An abuse of discretion is present when a trial court's decision "'is contrary to law, unreasonable, not supported by evidence, or grossly unsound.'" *Menke v. Menke*, 9th Dist. Summit No. 27330, 2015-Ohio-2507, ¶ 8, quoting *Tretola v. Tretola*, 3d Dist. Logan No. 8-14-24, 2015-Ohio-1999, ¶ 25. A trial court may exercise its discretion to permit the recall of a witness in order to correct testimony previously given through a mistake or oversight on the part of the witness. *State v. McBride*, 5th Dist. Stark No. 2008-CA-00076, 2008-Ohio-5888, ¶ 28-36. *See*, *e.g.*, *State v. Vielma*, 3d Dist. Paulding No. 11-11-03, 2012-Ohio-875, ¶ 29-31 (A trial court did not abuse its discretion when it permitted the State to recall a witness to clarify testimony regarding the location of an incident.); *State v. Smith*, 9th Dist. Lorain No. 89CA004620, 1990 WL 72366, *1-2 (May 23, 1990) (A trial court did not abuse its discretion by permitting the State to recall a witness regarding two questions that were overlooked.).

**{¶17}** As an initial matter, this Court notes that R.W. did not testify as an expert, but as the custodian of records for T-Mobile. *See generally* Evid.R. 702. In that capacity, he explained

the meaning of terms referenced on documents produced by T-Mobile and interpreted location data that was set forth in those documents. During his testimony, he explained the significance of service codes documented in the cellular phone records of L.S. for the date of his death, which were introduced by the State as State's Exhibit AJ. In doing so, R.W. referenced a second document, which was included in State's Exhibit AH. That document also provided definitions for each of the service codes.

{¶18} According to that second document, service code 2A means "Call Forwarding on No Reply" and service code 29 means "Call Forwarding on Mobile Subscriber Busy." During his testimony, R.W. reversed these definitions, explaining that service code 2A is assigned when a mobile user takes some action to refuse a call, such as swiping to ignore it, while service code 29 is assigned when a call is forwarded to voice mail with no action by the recipient. With respect to L.S.'s cellular phone records, therefore, R.W. testified that a number of calls to L.S.'s phone were actively rejected and forwarded to voicemail at a time after L.S. had been shot and his cellular phone was believed to be unattended in his residence or in police custody.

{¶19} The State realized the error in R.W.'s testimony after he had testified and initiated contact with R.W. to clarify the meaning of the service codes. Once T-Mobile confirmed that an error had been made, the State moved to recall R.W. for the purpose of correcting his testimony on that point. When he was recalled, R.W. explained that he had "inadvertently transposed the numbers in [his] head and just flip-flopped the explanation." R.W. also corrected his testimony regarding the calls that were received by L.S.'s cellular phone during the time period in question.

{¶20} R.W. was recalled not for purposes of addressing his credibility, as Mr. Brown maintains, but because his previous testimony contained an inadvertent mistake that led to the misinterpretation of State's Exhibit AJ and to potential confusion between his testimony and the

reference document contained in State's Exhibit AH. The State brought the erroneous testimony to the trial court's attention as soon as it was confirmed by T-Mobile, and R.W. was recalled before the State rested its case. Under these circumstances, this Court cannot conclude that the trial court abused its discretion by permitting the State to recall R.W. Mr. Brown's third assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 4

THE VERDICT IN THIS CASE IS AGAINST THE SUFFICIENCY OF THE EVIDENCE AND SHOULD BE REVERSED BECAUSE IT VIOLATES THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE CONSTITUTION OF THE STATE OF OHIO.

{¶21} In his fourth assignment of error, Mr. Brown argues that his convictions are not based on sufficient evidence. This Court does not agree.

{¶22} "Whether a conviction is supported by sufficient evidence is a question of law that this Court reviews de novo." *State v. Williams*, 9th Dist. Summit No. 24731, 2009-Ohio-6955, ¶ 18, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). The relevant inquiry is whether the prosecution has met its burden of production by presenting sufficient evidence to sustain a conviction. *Thompkins* at 390 (Cook, J., concurring). For purposes of a sufficiency analysis, this Court must view the evidence in the light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not evaluate credibility, and we make all reasonable inferences in favor of the State. *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991). The evidence is sufficient if it allows the trier of fact to reasonably conclude that the essential elements of the crime were proven beyond a reasonable doubt. *Id*.

{¶23} Mr. Brown was convicted of murder in violation of R.C. 2903.02(A) and (B), which provide:

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

R.C. 2903.02(A) requires that the person causing the death of another act purposely. "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶24} R.C. 2903.02(B), which prohibits felony murder, does not contain a mens rea component apart from the predicate offense. *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, ¶ 10, quoting *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, ¶ 43. "While the defendant must satisfy all the elements of the qualifying predicate offense—including any mens rea element specific to that criminal act—the felony-murder statute imposes no additional mens rea element with regard to the victim's death." *Owens* at ¶ 10. The predicate offense in this case was felonious assault in violation of R.C. 2903.11(A)(1) and (2), which provided, at the time:

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn;

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

"A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶25} For purposes of this assignment of error, Mr. Brown does not challenge the conclusion that he is the person who shot L.S. Instead, Mr. Brown argues that there is insufficient evidence supporting the conclusion that, with respect to R.C. 2903.02(A), he acted purposely and that, with respect to R.C. 2903.02(B) and R.C. 2903.11(A)(1) and (2), he acted knowingly. In this respect, this Court is mindful that "[i]ntent must be demonstrated with reference to the surrounding facts and circumstances" because

> "'The intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person, and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court.'"

*State v. Hanford*, 9th Dist. Summit No. 29204, 2019-Ohio-2987, ¶ 8, quoting *In re Washington*, 81 Ohio St.3d 337, 340 (1998), quoting *State v. Huffman*, 131 Ohio St. 27 (1936), paragraph four of the syllabus.

{¶26} Officer Christian Franco responded to L.S.'s residence for a welfare check in response to a report of a possible shooting. When he arrived, he found that the duplex was locked and lights were on. Through an open window, he heard music playing. Concerned that there could be an injured person inside, Officer Franco called out but received no response. He testified that he continued around the perimeter of the house to another open window, through which he saw the legs of an individual protruding from a bathroom doorway. Moving to the bathroom window, Officer Franco saw more of the body and noted the presence of blood. He testified that he decided to enter the residence and determined that the best point of entry would be a front window that could be accessed by removing an air conditioning unit.

{¶27} When he entered the house, Officer Franco noted no signs of struggle or forced entry. He testified that he moved from the front of the lower unit of the duplex toward the back. When he reached the back hallway, he saw the legs that he had seen from outside the residence.

Officer Franco testified that when he approached further, he saw L.S.'s body with a single gunshot wound to the area of his clavicle and a large amount of blood next to the body. He noted no signs of life and that the shooting did not appear to have "just happen[ed]." Officer Franco testified that once he located the victim, he returned to the front of the unit, informed a Sergeant that he had confirmed the presence of a body, secured the unit, and exited. During his testimony, Officer Franco confirmed the presence of bloody footprints in the unit from the bathroom to the entry area but testified that he did not step in any blood while in the residence.

{¶28} Detective Brian Denman was assigned to process the crime scene. He testified that he noted the presence of blood transfer stains on the floor inside the front door, on the carpet adjacent to the kitchen, and on the kitchen floor. He described what he noticed in the kitchen as partial footprints and noted that it appeared that someone had stepped in the blood pooled next to the victim's left side and walked through the residence. Detective Denman observed that the house was tidy and bore no indications of a struggle or forced entry. He testified that efforts to locate a shoe in the house with a tread pattern that matched the bloody footprints proved fruitless. Detective Denman noted that a 9 mm shell casing was recovered from the bathroom floor near L.S.'s body, but that police were unable to locate a firearm in the residence. A photograph of the bathroom where police found L.S.'s body depicts L.S. in a supine position with his head near the base of the toilet opposite the door. A red baseball cap can be seen on the floor near the toilet behind L.S.'s body, and a scarf can be seen draped over the toilet itself.

{¶29} Sergeant Dennis Camarillo was the lead investigator of L.S.'s death. He testified that the crime scene had been secured when he arrived. Sergeant Camarillo recalled that there were faint indications of blood transfer on the floor at the threshold to the house, in the living room, and on the carpet between the living room and kitchen threshold. He explained that as he

examined the floor in the kitchen, he noted that the pattern more distinctly resembled the tread of footwear. Sergeant Camarillo testified that there were also drops of blood present and that the trail led toward the hallway and bathroom area where L.S.'s body was found: "as you headed that way, each footprint became a little more defined and with a little higher concentration of blood[.]" Next to the body, Sergeant Camarillo noted "a significant amount of blood pooled to [L.S.'s] left side," which appeared to be the source of the bloody footprints. He also explained that "[b]ecause of * * * the nature of how they were left behind, it was clear that whoever left those bloody footprints was in close proximity to [L.S.] after he was shot."

{¶30} Sergeant Camarillo testified that the pool of blood was notable because "the blood coming from the wound goes in one direction, over from the front of [L.S.]'s body, chest, upper shoulder area, towards his back and onto the ground. * * * It all generated * * * from that source, and * * * it accumulated on the left side of his body." He also explained the significance of the location where police recovered the spent shell casing:

> [B]ecause it ejected to the right, * * * it was somewhere near - - either just inside the bathroom or at the threshold. And * * * since it ejects to the right, the firearm would have been fired, the casing would have ejected to the right, and in some fashion ended up in that corner where it was located. * * * [I]t indicates to me that the weapon was fired either right inside the bathroom or the, like the threshold of the bathroom door to the hallway. Right in that - - right by where [L.S.]'s body was found.

Sergeant Camarillo explained that his training and experience led him to conclude that L.S. was shot "right where he was found laying."

{¶31} Dr. Frank Miller, III, the Lorain County Chief Deputy Coroner, described the findings of L.S.'s autopsy. He explained that L.S. died as a result of a single gunshot wound inflicted by a bullet that entered his body just above his clavicle on the left side, travelled toward the center of his body, and exited the left side of his back around the midline of his body.

According to Dr. Miller, the bullet moved from front to back, from left to right, and "slightly upward[.]" Along this path, the bullet passed through the upper lobe of L.S.'s left lung, causing bleeding from the subclavian artery and vein. Dr. Miller explained that L.S.'s left lung would have filled with blood and that the corresponding blood loss to the brain L.S. experienced would cause him to lose consciousness within thirty seconds to two minutes and, within four or five minutes, would cause death.

{¶32} Dr. Miller explained that the single direction of L.S.'s blood flow indicates that he had been laying on his back, as he was found, and Dr. Miller testified that his injuries were consistent with being shot by someone standing over him. He also noted that if L.S. had been moving around after sustaining the gunshot wound, he would have been actively bleeding in large amounts. He testified that L.S.'s body bore numerous other abrasions and contusions that were sustained around the time of his death, including bruising between his skull and scalp in the area where his head rested on the bathroom floor.

{¶33} S.F., L.S.'s younger brother, described the events that took place on the morning of the shooting. He explained that Mr. Brown was not related to him and L.S. by blood but had a close relationship with them nonetheless. S.F. recalled that Mr. Brown arrived at the apartment that S.F. shared with L.S. sometime during the night before the shooting. S.F. was aware that Mr. Brown always carried a firearm. Early on the morning of July 14, 2016, Mr. Brown awakened S.F. to go with him to pick up his young son. According to S.F., Mr. Brown wore "[s]ome kind of long gown, like dashiki like – it's a type [of] robe-looking thing." Mr. Brown also wore a scarf and a hat. When they returned, according to S.F., L.S. was in the kitchen cooking. S.F. testified that Mr. Brown and L.S. began "talking jive back and forth[]" and "[h]orseplay[ing], like slap boxing, you know, just throwing punches at each other, just playing." He explained that "they was

just using their hands, and my brother * * * would use his feet, some of that[,]" and that they did not make "real hard contact[.]" S.F. testified that Mr. Brown still wore the outfit that he had worn earlier that morning.

{¶34} After the two disappeared from his sight, S.F. heard the sound of a gunshot from the area of the hallway between the bathroom and his own bedroom. He recalled that, seconds later, Mr. Brown came out of the back hall with a look on his face that S.F. described as "[h]orrified" and "[c]razed, enraged[.]" S.F. testified that Mr. Brown came toward him carrying a gun that he had seen in Mr. Brown's possession on previous occasions. Mr. Brown no longer wore the hat or scarf, which S.F. identified as those found by the police near L.S.'s body in the bathroom. S.F. explained that he left the apartment with Mr. Brown out of fear that he too would be shot and that he drove Mr. Brown's car away from the residence. He testified that once in the car, Mr. Brown said something along the lines of "'I had to pop that motherfucker[.]'" The two drove to a carwash, where S.F. noticed a bloodstain on the robe that Mr. Brown wore. S.F. testified that Mr. Brown removed the robe, placed it in a plastic bag, and left it in a garbage can. Surveillance video confirmed that after Mr. Brown discarded the robe, a gun was visible in the area of his waistband. Surveillance video from a nearby convenience store captured Mr. Brown buying a new shirt and changing into it. S.F. testified that Mr. Brown eventually entered a bank, where he secured a cash advance on his credit card. After S.F. entered the bank himself and hid under an employee's desk, Mr. Brown fled in his vehicle.

{¶35} These facts and circumstances surrounding the death of L.S.—including his statements and conduct after the crime was committed—viewed in the light most favorable to the State and with all inferences resolved in favor of the State, would allow the jury to reasonably conclude that it was Mr. Brown's specific intention to cause L.S.'s death by inflicting a single

gunshot wound at close range, either while Mr. Brown was standing at the location where his body was found or as he lay in that position after sustaining numerous other injuries near the time of his death. Alternatively, the jury could reasonably conclude that Mr. Brown knowingly inflicted serious physical harm upon L.S. or caused physical harm by means of a firearm and that his death resulted.

{¶36} Mr. Brown's convictions for murder are not based on insufficient evidence. His fourth assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 5

THE CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND OF THE OHIO CONSTITUTION.

{¶37} Mr. Brown's fifth assignment of error argues that his convictions are against the manifest weight of the evidence. This Court does not agree.

{¶38} When considering whether a conviction is against the manifest weight of the evidence, this Court must:

> review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). As with other elements of a crime, "the credibility of witnesses and their degree of certainty in identifying the defendant are matters affecting the weight of the evidence." *State v. Flynn*, 9th Dist Medina No. 06CA0096-M, 2007-

Ohio-6210, at ¶ 12, citing *State v. Gorgan*, 9th Dist. Medina No. 1824, 1990 WL 1771, *1 (Jan. 10, 1990).

{¶39} In support of his manifest weight argument, Mr. Brown maintains that S.F. was not a credible witness, that the physical evidence did not support his convictions, and that the results of the police investigation were unreliable. Unlike his arguments supporting his fourth assignment of error, Mr. Brown's manifest weight argument is based on the proposition that he is not the person who shot L.S.

{¶40} S.F. described the events before and after L.S. was shot in detail. He testified that both he and L.S. had a good relationship with Mr. Brown before the events in question. S.F. recalled that he had not been aware that Mr. Brown would be visiting from his residence in Kentucky, but that he saw Mr. Brown's gold Mercedes Benz parked outside when he returned home early on the morning of July 14, 2016. He testified that it was Mr. Brown's idea for the two men to pick up his young son and that L.S. was still asleep when they left to do so. S.F. testified that he drove the car and Mr. Brown provided directions. According to S.F.'s testimony, they picked up Mr. Brown's son at a location on West 20th Street, then drove to a location on South Broadway to visit a female friend of Mr. Brown's. There was no answer at the door at that location, and Mr. Brown testified that they then drove to a highrise apartment building in South Lorain to visit a man named G.C. Once there, according to S.F., Mr. Brown and his son went upstairs in the elevator while S.F. waited in the lobby. S.F. testified that after waiting between twenty and thirty minutes, Mr. Brown returned without his son, and they drove home.

{¶41} According to S.F., L.S. was awake and making food in the kitchen when they arrived. S.F. testified that L.S. was cooking grits, but during his cross-examination he noted that it was L.S.'s pattern to cook grits rather than what he observed. S.F. recalled that he was in the

kitchen making peanut butter and jelly sandwiches while L.S. and Mr. Brown were "horse playing[,]" and it is from there that he heard a gunshot from the area of the back hallway and bathroom. S.F. testified that Mr. Brown emerged from the hallway with a firearm in his hand that was pointed in S.F.'s direction. According to S.F.'s testimony, Mr. Brown said, "'Come on. Let's go.'" S.F. explained that he did what Mr. Brown told him to do because he was frightened and "in a state of shock." He recalled that Mr. Brown told him to drive the gold Mercedes and that he did so because he was afraid that he would be shot, although he did not recall whether Mr. Brown still had the gun out once they started driving.

{¶42} S.F. testified that Mr. Brown told him to drive to a carwash and, once they arrived, that he noticed a bloodstain of three or four inches in diameter on Mr. Brown's robe. S.F. acknowledged that although he knew some people at the carwash, he did not tell them what happened because he did not have an opportunity. After Mr. Brown changed clothes at the carwash, the two men walked to a neighboring convenience store. S.F. testified that he did not flee at that time because he was afraid of being shot, and he explained that he pulled his cellular phone out because he wanted to call someone for help but ultimately did not do so. S.F. recalled that he and Mr. Brown walked back to the carwash and got into Mr. Brown's car again.

{¶43} At this point, Mr. Brown drove, and S.F. rode in the passenger seat. S.F. explained that, in an effort to escape, he told Mr. Brown that he had to use the bathroom and asked to drive to his mother's home. When no one answered the doorbell, S.F. got back in the car. Their next stop was a gas station in Lorain, where Mr. Brown went inside while S.F. remained in the car alone about twenty-five feet away. S.F. explained that he did not flee because he "[couldn't] outrun no bullet."

{¶44} S.F. testified that their final stop was a bank branch in Amherst. He recalled that Mr. Brown first tried to obtain cash from an ATM then entered the bank while S.F. remained in the car. He testified that he waited until Mr. Brown was talking to a bank teller then entered the bank and told Mr. Brown that he was going next door to use the bathroom. S.F. explained that he went to the restroom of a business next door, locked the door, and tried to make a phone call. He acknowledged that he did not say anything about the situation to employees in the business when he left the restroom. Noticing that Mr. Brown's car was no longer parked outside the bank, S.F. returned, entered the bank, and hid under an employee's desk. He testified that he asked the employee to call the police and told her about the shooting. He also recalled that he called his mother and sister at that time. When interviewed by the police, S.F. identified Mr. Brown as the individual involved in the shooting with certainty.

{¶45} Mr. Brown argues that S.F.'s testimony cannot be considered credible because he made statements that were inconsistent with respect to certain details and acknowledged that he lied during interviews with the police. S.F.'s prior inconsistent statements and admitted falsehoods were, indeed, acknowledged at trial. The first officer who interviewed S.F. testified that he said Mr. Brown was covered in blood after the shooting. S.F. testified differently at trial, and he explained that if he had previously made this statement, it was false. He acknowledged that he had previously told police that he was outside the house when the shooting occurred and that he maintained this falsehood until his third interview with police on August 7, 2017. He admitted that he previously told his mother that he had crawled through the sunroof of Mr. Brown's car to escape when, in fact, he had tried to do so unsuccessfully. During his cross-examination, S.F. acknowledged that he omitted several details during his testimony—namely, that after leaving the carwash, he and Mr. Brown walked to a Family Dollar before going to the convenience store

because Mr. Brown wanted to find an ATM and, after they left the convenience store, that the two men rode with a third party to his house, where they sat on the porch talking. S.F. acknowledged that there were no items visible in photographs of the kitchen that were consistent with making peanut butter and jelly sandwiches. S.F. denied that he knew a former upstairs neighbor, T.W., although she testified that she knew and had done drugs with S.F. According to T.W.'s testimony, S.F. provided her with three different stories about how the shooting took place.

{¶46} Sergeant Camarillo confirmed discrepancies in S.F.'s prior statements. Inconsistencies notwithstanding, however, the testimony of other witnesses confirmed S.F.'s testimony to a significant degree. One of S.F. and L.S.'s neighbors testified that she had seen a gold vehicle parked at their house on the morning of July 14th and that she later saw a man she did not recognize wearing a robe that was white with green stripes. She identified Mr. Brown as the person she saw that morning. Another neighbor provided the police with security video footage that confirmed this testimony and S.F.'s timeline of events from early that morning. Cellular telephone tower data from Mr. Brown's cellular phone was generally consistent with the timeline of the day's events provided by S.F., and surveillance video obtained from the carwash, convenience store, and bank confirmed details in S.F.'s testimony. As Sergeant Camarillo observed, cellular phone extraction data was consistent with S.F.'s testimony regarding the calls that he attempted to place after the shooting.

{¶47} Other witnesses confirmed S.F.'s version of the events that happened once he entered the bank where Mr. Brown obtained a cash advance. T.G., a bank employee, testified that on the date in question, a man who appeared to be "extremely frightened, anxious, [and] in a hurry" entered the bank and hid under the desk in an office. T.G. recalled that the man said "he was kidnapped, there was a murder, to call the police." T.D., a former sergeant with the Amherst Police

Department, responded to the bank. He testified that he found a "very distraught" male who "was in a very excited state" and "obviously had been involved in some type of situation where his nerves were damaged." T.D. explained that the man, whom he identified as S.F., told him that Mr. Brown had been involved in a shooting at S.F.'s residence. According to T.D., S.F. provided him with the address where the shooting occurred, the identity of the shooter, and the make and model of Mr. Brown's vehicle.

{¶48} This Court must "'consider[] the credibility of witnesses'" as part of our manifest weight review. *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*, 20 Ohio App.3d at 175. Nonetheless, this Court is mindful of the well-established principle that a trier of fact enjoys the best position to assess the credibility of witnesses. *State v. Rivera*, 9th Dist. Lorain No. 18CA011263, 2019-Ohio-62, ¶ 39, quoting *State v. Johnson*, 9th Dist. Summit No. 25161, 2010-Ohio-3296, ¶ 15. Although S.F.'s testimony was inconsistent with his prior statements in some respects, this Court cannot conclude, as Mr. Brown suggests, that it must be disregarded entirely.

{¶49} Mr. Brown also argues that his convictions are against the manifest weight of the evidence because Sergeant Camarillo testified that the tread pattern on Mr. Brown's shoes did not match the bloody footprints at the scene. This fact is of limited value, however, because Sergeant Camarillo's testimony in this respect was qualified. Sergeant Camarillo testified that he submitted still-frame images from surveillance videos that captured the shoes that Mr. Brown was wearing after the fact to the FBI in the hope that they could provide useful information. The State stipulated "that the FBI could not make a match to the tread pattern[.]" Based on this stipulation, the defense did not move to admit the FBI report into evidence or obtain the testimony of the individual who performed the analysis. Consequently, there is no evidence in the record that would explain the meaning of this conclusion. In addition, the officers who processed the crime scene did not locate

any shoes in the apartment that matched the tread pattern present in the footprints, and the shoes that Mr. Brown wore at the time of the shooting were never recovered. There is no evidence in the record that tends to establish that the shoes that Mr. Brown wore in the photographs taken after the murder are the same shoes that he wore at the time—a fact that is especially significant given that other evidence demonstrates at least two occasions on which Mr. Brown changed into new clothing and discarded the old.

{¶50} Mr. Brown's final argument is that his conviction is against the manifest weight of the evidence because the results of the police investigation are not worthy of confidence. Specifically, Mr. Brown argues that the police did not gather latent fingerprints or touch DNA evidence or inspect certain exterior areas surrounding the property, including garbage cans, vehicles, and the backyards of neighbors. The investigating officers, however, described the scope of their investigation and explained why it was appropriate under the circumstances. *Compare State v. Dumas*, 9th Dist. Medina No. 20CA0029-M, 2021-Ohio-1534, ¶ 32. Moreover, there is no requirement that a conviction be supported by the introduction of scientific evidence. *See State v. Tyus*, 9th Dist. Summit No. 29520, 2020-Ohio-4455, ¶ 56, citing *State v. Finley*, 2d Dist. Montgomery No. 19654, 2004-Ohio-661, ¶ 31-36.

{¶51} Given the evidence at trial, we cannot conclude that this is the exceptional case in which the evidence weighs heavily against the conviction. *See Otten*, 33 Ohio App.3d at 340, citing *Martin*, 20 Ohio App.3d at 175. Mr. Brown's fifth assignment of error is overruled.

**ASSIGNMENT OF ERROR NO. 2**

THE TRIAL COURT ERRED WHEN IT FAILED TO PROPERLY INSTRUCT THE JURY OF THE LESSER INCLUDED OFFENSE OF RECKLESS HOMICIDE AND NEGLIGENT HOMICIDE, FOR COUNTS ONE AND TWO, MURDER AND THE LESSER INCLUDED OFFENSE OF ASSAULT AND NEGLIGENT ASSAULT, FOR COUNTS THREE AND FOUR, FELONIOUS ASSAULT.

{¶52}  Mr. Brown's second assignment of error argues that the trial court erred by failing to instruct the jury on lesser included offenses because the evidence does not demonstrate that Mr. Brown acted purposely or knowingly.  This Court does not agree.

{¶53}  When determining whether one offense is a lesser included offense of another, courts must consider "whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed."  *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, paragraph two of the syllabus.  In doing so, courts must compare the elements of each crime, and "[a]n offense that includes an element that another offense lacks cannot be a lesser included offense of that other offense."  *Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, at ¶ 8.

{¶54}  With respect to Mr. Brown's conviction for felony murder predicated on felonious assault, his argument that he was entitled to a jury instruction for reckless homicide fails under this analysis.  *Id.* at ¶ 9-12.  Because the felony murder statute imposes no additional mens rea apart from that required for the underlying offense, "reckless homicide[,]" which is the lesser offense, "has  an element that felony murder lacks—recklessness with regard to the death of the victim."  *Id*. at ¶ 10-12.  Mr. Brown's argument regarding negligent homicide and felony murder fails for the same reason.  R.C. 2903.05, which prohibits negligent homicide, requires negligence with regard to the death of the victim.  Consequently, negligent homicide—the lesser offense—contains an element that felony murder lacks.  *Compare Owens* at ¶ 11-12.

{¶55}  Mr. Brown also argues that the trial court erred by failing to instruct the jury on negligent and reckless homicide, with respect to his conviction for murder in violation of R.C. 2903.02(A), and negligent assault, with respect to the predicate offenses of felonious assault.

"Negligent homicide is not a lesser included offense of murder." *State v. Koss*, 49 Ohio St.3d 213 (1990), paragraph four of the syllabus. Reckless homicide, however, is a lesser included offense of murder in violation of R.C. 2903.02(A). *State v. Ivery*, 9th Dist. Summit No. 28551, 2020-Ohio-3349, ¶ 8, 30. Negligent assault is also a lesser included offense of felonious assault. *State v. Robinson-Bey*, 9th Dist. Summit No. 28740, 2018-Ohio-5224, ¶ 46.

{¶56} A jury instruction on a lesser included offense, however, is required only when the evidence presented at trial "would reasonably support *both* an acquittal on the crime charged and a conviction upon the lesser included offense." (Emphasis added.) *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus. In making this determination, courts must view the evidence in the light most favorable to the defendant. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 37, citing *State v. Campbell*, 69 Ohio St.3d 38, 47-48 (1994). Mr. Brown's arguments are focused on the mens rea necessary to establish the offenses of which he was convicted. Consequently, he argues that the evidence at trial would reasonably support an acquittal on the murder and felonious assault charges because it does not demonstrate that he acted purposefully, with respect to murder, or knowingly, with respect to felonious assault.

{¶57} In support of his arguments, Mr. Brown points to S.F.'s testimony that Mr. Brown and L.S. enjoyed a good relationship, that they were engaged in horseplay prior to the shooting, and that he did not witness the shooting itself. As discussed in connection with Mr. Brown's fourth assignment of error, however, the trial record is replete with evidence tending to demonstrate that Mr. Brown acted purposefully or knowingly. Even viewing the evidence at trial in the light most favorable to Mr. Brown, this Court cannot conclude that Mr. Brown could reasonably have been acquitted of murder or felonious assault. Because a jury instruction on a lesser included offense is only required when the evidence presented at trial "would reasonably support *both* an acquittal

on the crime charged and a conviction upon the lesser included offense[,]" Mr. Brown's arguments fail on that basis. (Emphasis added.) *Thomas* at paragraph two of the syllabus.

**{¶58}** Mr. Brown's second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 6

MR. BROWN DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL
AS GUARANTEED BY THE SIXTH AMENDMENT.

**{¶59}** In his sixth assignment of error, Mr. Brown argues that he received ineffective assistance of counsel in the trial court. Specifically, Mr. Brown attributes the delay in bringing his case to trial to the actions of counsel and argues that the delay deprived him of a fair trial. This Court does not agree.

**{¶60}** In order to demonstrate ineffective assistance of counsel, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable possibility that the outcome of the trial would have been different. *Id*. at 694. "A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other." *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000), citing *Strickland* at 697.

**{¶61}** As discussed in this Court's disposition of his first assignment of error, Mr. Brown expressly waived his right to a speedy trial in writing and did not file a formal objection and demand for trial. *See generally King*, 70 Ohio St.3d at 160, citing *O'Brien*, 34 Ohio St.3d at paragraph one of the syllabus; *Bray*, 2004-Ohio-1067, at ¶ 8. The record does not demonstrate a deficiency in the performance of counsel in this regard. *See generally Madrigal* at 390-391 (noting

that in a direct appeal, ineffective assistance of counsel must be demonstrated by evidence within the record).

{¶62} Even if the pretrial delay could be attributed to deficient performance on the part of trial counsel, this Court could not conclude that the record demonstrates that Mr. Brown was prejudiced. Mr. Brown suggests that witnesses at trial must necessarily have suffered from lapses in memory over time and, consequently, that the result of his trial would have been different had he been brought to trial sooner. In support of this argument, he points to the testimony of a single witness regarding a single issue: during his cross-examination, Sergeant Camarillo testified that he submitted images of Mr. Brown's shoes to the FBI in the hopes of obtaining a match for the tread pattern, but Sergeant Camarillo did not at first recall that he had received a report from the FBI. As discussed in connection with Mr. Brown's fifth assignment of error regarding manifest weight, however, Sergeant Camarillo's testimony regarding the tread evidence was of limited value to the defense regardless.

{¶63} Mr. Brown's suggestion that this Court can extrapolate from this single facet of Sergeant Camarillo's testimony that his entire trial was tainted by faded memories is also not persuasive. Prejudice owing to ineffective assistance of counsel cannot be demonstrated by means of conjecture or speculation. *Compare State v. McQuistan*, 9th Dist. Medina No. 18CA0104-M, 2019-Ohio-3612, ¶ 25 (considering a speculative prejudice argument in the context of a petition for postconviction relief). There are difficulties inherent in proving prejudice as a result of fading memory over time. *See generally State v. Jones*, 148 Ohio St.3d 167, 2016-Ohio-5105, ¶ 19-29 (discussing proof of "actual prejudice" in the context of preindictment delay). In this case, the testimony at trial was both extensive and detailed, and the exhibits were exhaustive.

{¶64} Mr. Brown's final argument regarding prejudice is that trial counsel, who was Mr. Brown's third attorney, must necessarily have lacked time to prepare. He maintains that after his first attorney withdrew, his second attorney withdrew because he did not have time to prepare. These representations, however, are inconsistent with the record. Mr. Brown's second attorney withdrew not because there was insufficient time to prepare for trial, but because he had unexpected medical problems that prevented him from trying the case. His third attorney assured the trial court that he could be adequately prepared for trial, and there is nothing in the record to the contrary. Accordingly, the record does not indicate that the result of Mr. Brown's trial would have been different absent the delay that occurred.

{¶65} Mr. Brown's sixth assignment of error is overruled.

### III.

{¶66} Mr. Brown's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to

mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
TEODOSIO, J.
CONCUR.

APPEARANCES:

GIOVANNA V. BREMKE, Attorney at Law, for Appellant.

J. D. TOMLINSON, Prosecuting Attorney, and BRIAN P. MURPHY, Assistant Prosecuting Attorney, for Appellee.