[Cite as *State v. Coleman*, 2022-Ohio-3808.]

STATE OF OHIO       )                  IN THE COURT OF APPEALS
)ss:               NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

| | |
|---|---|
| STATE OF OHIO | C.A. No. 30133 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| CHARLES COLEMAN | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 19 11 4173 |

DECISION AND JOURNAL ENTRY

Dated: October 26, 2022

TEODOSIO, Presiding Judge.

{¶1} Defendant-Appellant, Charles Coleman, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Sometime around 2:00 a.m., gun fire erupted near the intersection of East Market Street and Summit Street in Akron. Two officers on scene saw a male in a green hooded sweatshirt firing from an area near the front door of Summit Artspace and returned fire. When the male ran south, the officers pursued but were unable to immediately locate him. Several minutes later, however, one of the officers spotted a male in an identical green hooded sweatshirt walking near the intersection of East Market Street and Summit Street. Officers detained the man, who was later identified as Mr. Coleman, and soon found a discarded AK-47 in the area. Forensic testing matched 24 fired shell casings at the scene to the AK-47 and uncovered a male DNA profile

consistent with Mr. Coleman's profile on the gun. Additionally, swabs taken from Mr. Coleman's hand tested positive for the presence of gunshot residue.

{¶3} Shortly after the shooting, two individuals arrived at Akron Children's Hospital seeking treatment for gunshot wounds. One of the individuals, J.M., had been shot in the arm and indicated that he was struck while riding in a vehicle traveling south on Summit Street. The second individual had been shot in the ankle and had run up to the vehicle in which J.M. was a passenger to secure a ride to the hospital. Although J.M. claimed not to know the injured man who rode to the hospital with him, the police later identified the man as C.O.

{¶4} As a result of the foregoing incident, Mr. Coleman was charged with four counts of felonious assault. Two of the counts pertained to J.M. and were charged as violations of R.C. 2903.11(A)(1) and (A)(2). The two remaining counts pertained to C.O. and were likewise charged as violations of R.C. 2903.11(A)(1) and (A)(2). A firearm specification was linked to each count for a total of four firearm specifications.

{¶5} The trial court set a bond for Mr. Coleman three days after his arrest, but he was never able to pay it. He remained incarcerated while awaiting trial in this case, as well as a second, unrelated case stemming from an incident in October ("the October case"). It is undisputed that the trial court consolidated this case and the October case for purposes of any pretrial hearings and trial.

{¶6} Following several continuances at Mr. Coleman's request, the trial court scheduled the trial for April 6, 2020. Yet various events, including the onset of the global pandemic, prevented the trial from going forward. Numerous continuances ensued with the attorneys and the trial court convening multiple times through telephone and video conferences. Finally, the trial

court set the matter for trial on July 12, 2021. The trial court judge notified the parties that she would be absent that day and a visiting judge would be presiding over the trial.

{¶7} On the morning of his scheduled trial, Mr. Coleman filed a motion to dismiss his indictment on speedy trial grounds. The State responded in opposition to his motion to dismiss, and a hearing was held before the visiting judge. The visiting judge determined that each day Mr. Coleman had spent in jail counted as a single day for purposes of his speedy trial time, as he was also being held in jail in conjunction with the October case. The visiting judge further determined that various events had tolled Mr. Coleman's speedy trial time, including reasonable continuances the trial court had ordered due to COVID-19. Based on her conclusion that Mr. Coleman's speedy trial time had not yet expired, the visiting judge denied his motion to dismiss his indictment.[1]

{¶8} A jury found Mr. Coleman guilty on all four counts of felonious assault and each of his firearm specifications. The trial court indicated that it would be merging the counts against each victim, and the State elected to proceed on the counts charged as violations of R.C. 29011.(A)(2). The trial court sentenced Mr. Coleman to an indefinite term of six to nine years in prison on each of his felonious assault counts and mandatory three-year terms on each of his firearm specifications. The court ordered the indefinite terms to run concurrently with one another but consecutive to the mandatory three-year terms. It further ordered the three-year terms to be served first and consecutively with one another. Consequently, Mr. Coleman was sentenced to a total of twelve to fifteen years in prison.

---

[1] The trial court granted Mr. Coleman's motion to dismiss in the October case. That dismissal is the subject of a State's appeal. *See State v. Coleman*, 9th Dist. Summit No. 30060, 2022-Ohio-____. This Court declined to consolidate the State's appeal in the October case and Mr. Coleman's appeal in this case. However, the two decisions are being released simultaneously as the speedy trial issues presented in the appeals are interrelated.

{¶9} Mr. Coleman now appeals from the trial court's judgment and raises five assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

THE TRIAL COURT VIOLATED APPELLANT'S RIGHT TO A SPEEDY TRIAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION[.]

{¶10} In his first assignment of error, Mr. Coleman argues that the trial court erred when it denied his motion to dismiss his indictment on speedy trial grounds. We disagree.

{¶11} "When a trial court denies a motion to dismiss on speedy trial grounds, this Court reviews questions of law de novo, but considers whether the trial court's factual determinations are clearly erroneous." *State v. Burroughs*, 9th Dist. Lorain No. 14CA010595, 2016-Ohio-1139, ¶ 4. "The Supreme Court of Ohio has found that the statutory speedy trial provisions set forth in R.C. 2945.71 are coextensive with Ohio and federal constitutional speedy trial provisions." *State v. Gaines*, 9th Dist. Lorain No. 00CA008298, 2004-Ohio-3407, ¶ 9.

{¶12} A defendant charged with a felony generally must be brought to trial within 270 days of his arrest. R.C. 2945.71(C)(2). "When a defendant is incarcerated without bail on the pending charge, each day is counted as three days." *State v. Brown*, 9th Dist. Lorain No. 20CA011618, 2021-Ohio-2540, ¶ 9, citing R.C. 2945.71(E). "This 'triple-count' provision, however, only applies when the defendant is being held solely on the charge at issue." *State v. Gall*, 9th Dist. Lorain No. 18CA011445, 2019-Ohio-4907, ¶ 5. "If the accused is also being held in jail on other charges, the triple-count provision is inapplicable." *State v. Stephens*, 9th Dist. Summit No. 26516, 2013-Ohio-2223, ¶ 12. *Accord State v. MacDonald*, 48 Ohio St.2d 66, 71 (1976).

{¶13} "Acknowledging that 'some degree of flexibility is necessary,' the General Assembly has 'allowed for extensions of the time limits for bringing an accused to trial in certain circumstances.'" *State v. Hughey*, 9th Dist. Wayne No. 19AP0049, 2020-Ohio-3526, ¶ 4, quoting *State v. Ramey*, 132 Ohio St.3d 309, 2012-Ohio-2904, ¶ 24. "R.C. 2945.72 contains an exhaustive list of events and circumstances that extend the time within which a defendant must be brought to trial." *Ramey* at ¶ 24. The tolling events enumerated therein include "[a]ny period of delay necessitated by * * * motion, proceeding, or action made or instituted by the accused[,]" R.C. 2945.72(E), "[t]he period of any continuance granted on the accused's own motion," R.C. 2975.72(H), and "the period of any reasonable continuance granted other than upon the accused's own motion[,]" *id.* "Invariably, resolution of [the] question [of reasonableness under R.C. 2975.72(H)] depends on the peculiar facts and circumstances of a particular case." *State v. Saffell*, 35 Ohio St.3d 90, 91 (1988).

{¶14} Mr. Coleman was arrested on November 9, 2019, so his speedy trial time began to run the following day. *See State v. Browand*, 9th Dist. Lorain No. 06CA009053, 2007-Ohio-4342, ¶ 12. Because he remained in jail in lieu of bond, each day he spent in jail initially counted as three days. *See Brown*, 2021-Ohio-2540, at ¶ 9, citing R.C. 2945.71(E). On November 12th, however, the trial court revoked his bond in the October case. Mr. Coleman concedes that the triple-count provision ceased to apply once the court revoked his bond. *See Gall* at ¶ 5; *Stephens*, 2013-Ohio-2223, at ¶ 12. Thus, while nine days of his speedy trial time elapsed between November 10, 2019, and November 12, 2019, each day Mr. Coleman spent in jail thereafter counted as a single day.

{¶15} A pretrial was held on December 18, 2019, and, at that time, Mr. Coleman moved for a continuance. The trial court granted his motion and continued the matter until January 8,

2020. Mr. Coleman's request for a continuance tolled his speedy trial time from December 18, 2019, until January 8, 2020. *See* R.C. 2975.72(H). At that point, 45 days of his speedy trial time had elapsed (9 days of previously calculated time plus 36 days between November 12th and December 18th) and 225 days remained.

{¶16} On January 8, 2020, the trial court, both attorneys, and Mr. Coleman signed a jury trial order setting this matter for trial on April 6, 2020. The January 8th order specifically provided that the trial was being set for April 6th "[a]t the Defendant's request * * *." As previously noted, any period of delay necessitated by a "motion, proceeding, or action made or instituted by the accused" constitutes a tolling event. R.C. 2945.72(E). The same is true for any continuances granted upon an accused's own motion. R.C. 2945.72(H). Mr. Coleman has not challenged the language in the trial court's order, which he signed, indicating that the trial was set for April 6th, at *his* request. This Court will not construct an argument on his behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). Because the trial court selected the April 6th date at Mr. Coleman's request, his speedy trial time was further tolled by that request.

{¶17} Mr. Coleman concedes that his speedy trial time was tolled from March 9, 2020, through July 30, 2020, as a result of tolling orders issued in response to COVID-19. *See Executive Order 2020-01D Declaring a State of Emergency*, https://coronavirus.ohio.gov/static/publicorders/Executive-Order-2020-01D.pdf (accessed September 2, 2022); *In re Tolling of Time Requirements Imposed by Rules Promulgated by the Supreme Court and Use of Technology*, 158 Ohio St.3d 1447, 2020-Ohio-1166 ("the Tolling Order"). The Tolling Order expired on July 30, 2020, so Mr. Coleman's speedy trial time would have resumed the following day. Yet, Mr. Coleman concedes that he had a motion to modify his

bond pending at that time and, before the trial court ruled on that motion, he moved to continue the trial. The trial court continued the trial until November 2, 2020, at Mr. Coleman's request. Both Mr. Coleman's motion to modify his bond and to continue the trial further tolled his speedy trial time. *See* R.C. 2945.72(E) and (H).

{¶18} The trial court ultimately continued Mr. Coleman's trial several more times. Those continuances occurred on November 10, 2020, November 30, 2020, and February 10, 2021. The February continuance resulted in the trial being set for July 12, 2021, which is the date Mr. Coleman filed his motion to dismiss. The record reflects that, before ordering each continuance, the trial court met with the attorneys by telephone or videoconference to discuss the status of the case.

{¶19} Mr. Coleman never objected to the November 10th, November 30th, or February 10th continuances at the trial court level. However, he now asserts that those continuances were unreasonable, and thus, not tolling events. *See* R.C. 2945.72(H) (court-ordered continuances not requested by the accused are tolling events only if "reasonable"). While acknowledging that the trial court's written orders cited the COVID-19 pandemic and certain standing orders of the Summit County Court of Common Pleas, Mr. Coleman claims the primary reason the trial court judge continued the trial was because her courtroom was undergoing a "renovation" to install new technology. He argues that the trial court never approached the administrative judge to ask whether his trial could go forward or attempted to hold his trial in a different courtroom. According to Mr. Coleman, under the trial court's line of reasoning, COVID-19 could be cited to suspend a defendant's right to trial indefinitely. Because the trial court's unreasonable continuances did not constitute tolling events, Mr. Coleman argues, his speedy trial time expired before his scheduled trial date and the trial court erred when it denied his motion to dismiss.

{¶20} During the telephone status conference that preceded the trial court's November 10th continuance, the trial court informed the parties that the trial would need to be continued for several reasons. The primary reason the trial court offered for the continuance was that the courtroom was being updated and would not be ready for trial. Though Mr. Coleman has described those courtroom updates as "renovations[,]" it is clear from the record that those updates were directly related to the pandemic. The trial court elaborated in its November 10th journal entry of continuance that a continuance was necessary, in part, due to "the current infrastructure of the Court, lack of a reasonable alternate location, the Court's poor acoustics coupled with additional sound dampening of plexiglass and mandatory mask wearing required to protect the public health, [and] lack of technological sound amplification and enhancement * * *." Moreover, during the telephone status conference, the trial court noted that there had been a recent uptick in COVID-19 cases. The trial court's November 10th journal entry of continuance specifically cited the ongoing pandemic and recent trends in the number of COVID-19 cases as additional factors in its decision to continue the trial.

{¶21} During the videoconference that preceded the trial court's November 30th continuance, the trial court once again noted that the courtroom might not be ready in time for the scheduled trial. More importantly, however, the trial court cited a standing order of the Summit County Court of Common Pleas regarding the scheduling of jury trials. That standing order restricted the scheduling of jury trials in any cases in which the accused's speedy trial time was not in danger of expiring. It also required trial courts to secure permission from the Administrative Judge before scheduling any jury trials. Because Mr. Coleman's speedy trial time was not in danger of expiring, the trial court explained, his cases did not meet the criteria established by the standing order. The trial court's November 30th journal entry of continuance specifically cited the

ongoing pandemic, related issues with the courthouse and courtroom, and standing orders of the Summit County Court of Common Pleas as factors in its decision to continue the trial.

{¶22}  Finally, during the telephone status conference that preceded the February 10th continuance, the trial court indicated that she would approach the Administrative Judge to seek scheduling approval for the trial if Mr. Coleman's cases satisfied the criteria established by the standing order.  The trial court then asked the State to calculate Mr. Coleman's speedy trial time, and the State confirmed that a significant amount of time remained to bring Mr. Coleman to trial. Mr. Coleman did not object to the State's calculations or its representation that significant time remained.  Because Mr. Coleman's speedy trial time was not in danger of expiring, the court explained, his cases did not satisfy the criteria established in the standing order.  The trial court's February 10th journal entry of continuance specifically cited the ongoing pandemic, related issues with the courthouse and courtroom, and standing orders of the Summit County Court of Common Pleas as factors in its decision to continue the trial.

{¶23}  While this Court is not without sympathy for the delays imposed upon criminal defendants as a result of the COVID-19 pandemic, the Ohio Supreme Court has recognized that "continuing a trial because of a pandemic state of emergency is 'reasonable.'"  *In re Disqualification of Fleegle*, 161 Ohio St.3d 1263, 2020-Ohio-5636, ¶ 7, quoting R.C. 2945.72(H). The record supports the conclusion that the trial court balanced Mr. Coleman's speedy trial rights against the inherent risks to the public in congregating for trial during a pandemic.  Mr. Coleman neither objected to the trial court's speedy trial calculations, nor questioned the reasonableness of the continuances ordered by the trial court.  The fact that he did not do so "is indicative [of the fact] that the delay was reasonable."  *State v. Hughey*, 9th Dist. Wayne No. 19AP0049, 2020-Ohio-3526, ¶ 10.  Upon the particular facts and circumstances presented herein, we must conclude that

the continuances the trial court ordered were reasonable, and thus, constituted tolling events. *See Saffell*, 35 Ohio St.3d at 91; R.C. 2945.72(H).

**{¶24}** Because Mr. Coleman's speedy trial time had not yet expired when he filed his motion to dismiss, the trial court did not err by denying his motion. Accordingly, Mr. Coleman's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE VERDICT OF THE TRIAL COURT WAS AGAINST THE MANIFEST
WEIGHT OF THE EVIDENCE[.]

**{¶25}** In his second assignment of error, Mr. Coleman argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶26}** A challenge to the manifest weight of the evidence concerns the State's burden of persuasion. *State v. Klafczynski*, 9th Dist. Medina No. 18CA0084-M, 2020-Ohio-3221, ¶ 7. This Court has stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶27} Following the merger of his offenses as allied offenses of similar import, Mr. Coleman was convicted of two counts of felonious assault and two related firearm specifications. His felonious assault convictions required the State to prove that he knowingly caused or attempted to cause physical harm to J.M. and C.O. "by means of a deadly weapon or dangerous ordnance." R.C. 2903.11(A)(2). Mr. Coleman argues that the jury lost its way when it convicted him because the evidence against him was entirely circumstantial and speculative, at best. He notes that the State was never able to connect the bullets that struck J.M. and C.O. with a specific gun, so they could have been shot by anyone. He also notes that he was able to explain why the State found gunshot residue on his hands and his DNA on an AK-47 used during the shooting. According to Mr. Coleman, the State's evidence did not tend to show that he shot J.M. and C.O.

{¶28} Officers Nicholas Antonucci and Cory Siegferth were partnered on third shift when they received a report that patrons at an Akron nightclub had firearms inside the establishment. The officers began driving to the nightclub, which was located near the intersection of East Market Street and Summit Street. As they approached that intersection from the west, the officers saw several cars speeding or drag racing through the intersection from the north and continuing south on Summit Street. Officer Siegferth, who was seated in the front passenger seat of the cruiser, then heard a sound consistent with a car crash through his open window. Officer Antonucci continued to drive until their cruiser reached the intersection, at which point gunfire erupted. Officer Antonucci responded by immediately pulling to a stop. The cruiser came to rest at a southeastern angle with its front end turned slightly onto Summit Street.

{¶29} Officer Siegferth testified that he could see a male standing near the front door of the Summit Artspace building on South Summit Street. The male was shooting a long gun and appeared to be firing it across the street to the west. As the male continued to rapidly fire the gun,

the resulting muzzle flashes helped illuminate his body. Officer Siegferth was able to see that the male was wearing a dark green hooded sweatshirt. While remaining seated in the cruiser, Officer Siegferth fired his service weapon at the male by extending his arms through his open window. When he stopped firing, he saw the male run southbound on the sidewalk toward the southwest corner of the Summit Artspace building. Although the scene was chaotic and many people were outside when the shooting transpired, Officer Siegferth testified, he never saw anyone but the shooter on the sidewalk in front of Summit Artspace.

{¶30}    Officer Antonucci likewise testified that he saw an individual standing near the front door of Summit Artspace firing a long gun. From the muzzle flashes the gun emitted, he saw the individual was a black male wearing a green hooded sweatshirt. He observed that the gun had a banana clip, which he was able to see because the male was shooting at an angle roughly perpendicular to their position. Officer Antonucci testified that he opened his driver's door, stood, and fired his gun at the male. As he shot at the male, the male continued to fire his gun. When Officers Siegferth and Antonucci finally stopped shooting, Officer Antonucci testified, the male ran southbound. Officer Antonucci then quickly reentered the cruiser so they could pursue the male.

{¶31}  Officers Siegferth and Antonucci both testified that they drove south on Summit Street and pulled into the parking lot directly to the south of Summit Artspace. When they did not see the shooter, Officer Antonucci made a U-turn and parked the cruiser in the parking lot's apron. Both officers then exited the cruiser and walked north on Summit Street. A white Chrysler was parked on Summit Street, facing north, near the front door of Summit Artspace. Realizing that there were several females inside the car who had been there when the shooting occurred, Officer

Siegferth quickly checked the females for injuries and ordered them to remain there. During that brief exchange, Officer Antonucci continued to walk north toward East Market Street.

{¶32} As Officer Antonucci reached the intersection of East Market Street and Summit Street, he saw a silver Dodge Challenger stopped in the intersection and a black male in a green hooded sweatshirt approaching the car from the east. Officer Antonucci immediately stopped the male, who was later identified as Mr. Coleman, because his appearance matched that of the shooter. Both Officers Antonucci and Siegferth confirmed that the dark green hooded sweatshirt Mr. Coleman was wearing was the same sweatshirt they had seen the shooter wearing a few minutes earlier.

{¶33} The State set forth evidence that the white Chrysler parked in front of Summit Artspace was registered to Mr. Coleman's sister at the time of the shooting. While canvassing the parking lot that abutted the southern wall of Summit Artspace, Officer Kathryn Hight found a set of car keys on the ground. The keys were situated about midway between the southwest and southeast corners of the Summit Artspace building. Detective James Soroky was later able to test the keys in the white Chrysler's ignition and succeeded in starting the car.

{¶34} The State set forth evidence that, just to the east of the Summit Artspace building lies a concrete retaining wall. The retaining wall divides the Summit Artspace building and its parking lot from a vehicle access road that lies to the east and serves as an entryway from East Market Street. The retaining wall runs along the entire east side of the Summit Artspace building and its parking lot. Additionally, a chain link fence connects the southeast corner of the Summit Artspace building to the retaining wall, effectively closing off the space between the east side of the building and the retaining wall.

**{¶35}** Officer Stephen Vari helped search both sides of the retaining wall following the shooting. There was testimony that the retaining wall was 7.5 feet high on its west side (i.e., the side facing Summit Artspace), but significantly shorter on its east side due to the access road sitting at a higher elevation. Officer Vari testified that he discovered a long gun lying on the access road near the retaining wall. The gun lay nearby the area of the wall where, on its opposite side, the chain link fence connecting the retaining wall to the Summit Artspace building was located. There was evidence that, even without use of the fence, Detective Soroky was able to scale the west side of the retaining wall in three seconds. Further, Officer Siegferth estimated that it would have taken him less than twenty seconds to run around the entirety of the Summit Artspace building and emerge back on East Market Street.

**{¶36}** An analyst from the Bureau of Criminal Investigation ("BCI") examined the long gun Officer Vari found and determined that the gun, which was an AK-47, was operable. BCI Special Agent Daniel Boerner testified that the gun could hold 30 rounds in its extended clip and was empty when the police found it. His crime scene unit was able to find 24 AR-style shell casings near the front door of Summit Artspace, an unfired round of the same caliber in that same location, and an unfired round of the same caliber in front of the Dodge Challenger Mr. Coleman approached immediately before Officer Antonucci detained him. A ballistics expert from BCI examined the shell casings found at the scene and reported that the casings had been fired from the gun Officer Vari found.

**{¶37}** BCI analysts were unable to uncover any DNA profiles of sufficient quality on swabs taken from the shell casings and live rounds found at the scene. Yet, the AK-47 returned results with respect to swabs taken from its trigger/trigger guard and foregrip. A DNA analyst

testified that she was able to detect two major DNA profiles on those areas of the gun and that Mr. Coleman's DNA was consistent with one of those major profiles.

{¶38} Detectives interviewed Mr. Coleman at the police station a few hours after the shooting, and the State played the recording of that interview for the jury. Mr. Coleman initially told the detectives he had heard shots fired but claimed he could not recall a single other detail from that evening. When the detectives tried asking him more questions, Mr. Coleman either refused to answer, answered their questions with a different question, or accused the detectives of disrespecting him as a man by asking him questions to which they already knew the answers. Mr. Coleman also initially refused to allow the detectives to swab his hands for gunshot residue, only relenting when uniformed officers came into the room to assist with the collection. A gunshot residue analyst from BCI tested the sample taken from Mr. Coleman's hand and found it positive for the presence of gunshot residue.

{¶39} The State produced evidence that, in investigating the shooting, Special Agent Boerner and his crime scene unit identified three cars of interest. The first car was the White Chrysler whose registered owner was Mr. Coleman's sister. Special Agent Boerner testified that the car had been parked on Summit Street just south of the front door of Summit Artspace. He indicated that the car had been parked facing north such that its passenger's side was next to Summit Artspace. Special Agent Boerner was able to identify at least three areas of suspected ballistic impact on the car. Though he was unable to determine the caliber of the bullets that had struck the car, he indicated that the damage was consistent with shots having been fired from an area outside the passenger's side of the car and across the car.

{¶40} The second car of interest the police found at the scene was a black Dodge Magnum. The police found the car abandoned on the west side of Summit Street, south of Summit Artspace.

The car had been driven partially onto the sidewalk, its front end was totaled, and its airbags had deployed. Sergeant Boerner was able to identify eight areas of suspected ballistic impact on the car. He testified that shots had been fired at the driver's side of the car and had penetrated through the car. He further testified that the trajectory of those shots was consistent with the shooter firing from an area near the front of the Summit Artspace building and aiming across the street. Though the police were able to identify the registered owner of the Magnum, the owner did not testify at trial and was not one of the victims named in the indictment.

{¶41} The third car of interest the police found near the scene was a black Chrysler 300. The police found the car abandoned on the Mill Street bridge to the southeast of Summit Artspace. The car was left in the middle of the street, its left front bumper was damaged, and its right front tire was off and found lying on a nearby sidewalk. Sergeant Boerner was able to identify one ballistic impact on the driver's door of the car. Based on the angle the bullet had struck the car, he testified that the shot had been fired toward the driver's side of the car when the car had already driven past the shooter. Though the police were able to identify the registered owner of the Chrysler 300, the owner did not testify at trial and was not one of the victims named in the indictment.

{¶42} J.M., one of the victims named in the indictment, testified at trial only after the court issued a material witness warrant to secure his appearance. J.M. testified that he was fifteen years old at the time of the shooting and was shot in his left arm while inside a moving car. He acknowledged that the shooting occurred after he left the nightclub on East Market Street and Summit Street, but he refused to divulge the name of the person who was driving the car when he got shot. J.M. claimed he was riding in a Cadillac and that he was hit by crossfire when a bullet came across the driver's side of the car. According to J.M., he heard a car crash take place behind

him before gunshots rang out. He testified that he then felt a shot hit his arm but never saw the shooter.

{¶43} J.M. testified that, immediately after he was shot in the arm, he told the driver of the Cadillac that he needed to go to the hospital. He testified that the driver proceeded to a stop sign at the end of the road and accidentally turned the wrong way on Mill Street. When the driver made a U-turn and came back across the bridge on Mill Street, J.M. testified, they saw a black car parked in the middle of the road. J.M. indicated that the car looked as if it had been involved in a crash and had been abandoned. As they drove away from the black car, J.M. indicated that they saw a man running toward their car. J.M. testified that the man ran up to their car, opened the back door, said he had been shot in the foot, and climbed in so he could go to the hospital with them. J.M. claimed that he did not know the man and never learned his name.

{¶44} The State introduced surveillance recordings from Akron Children's Hospital, and J.M. confirmed that the recordings showed him arriving there for treatment. In the recordings, J.M. and a second man can be seen emerging from a car and walking towards the hospital's entrance before the car pulls away. J.M. confirmed that the man who walked into the hospital with him was the man who had been shot in the foot.

{¶45} Sergeant Michael Orrand acted as the lead investigator in this case, and the State relied on his testimony to establish that the man who came to the hospital with J.M. was C.O. Sergeant Orrand testified that the police knew where C.O. lived, but he was unwilling to answer his door or take their calls. Sergeant Orrand confirmed that, during the investigation, he reviewed C.O.'s medical records. He testified that those medical records indicated that C.O. was involved in a car crash and sustained a gunshot wound to his left ankle.

{¶46} The State also introduced through Sergeant Orrand recordings of phone calls Mr. Coleman made from the jail. During one of those calls, Mr. Coleman asked the person with whom he was speaking who had been shot that evening. When the person said "Fats" had been shot, Mr. Coleman paused and then laughed before asking who else had been shot. During his testimony, J.M. confirmed that his nickname was "Fats."

{¶47} Mr. Coleman called his sister to testify as a defense witness. The sister testified that she and several friends went out the evening of the shooting and Mr. Coleman agreed to be their designated driver. It was her testimony that she returned to her white Chrysler at the end of the evening with three other females, but Mr. Coleman was not with them. She recalled waiting for him in the car with the engine running but could not remember who had the keys or who had started the car. As she waited in her car, the sister testified, she heard the screech of tires right before a car struck the driver's side of her car. The sister indicated that she did not know who hit her car but, immediately thereafter, gunshots erupted. She testified that she never saw the shooter because she crouched down when the shots began.

{¶48} Mr. Coleman testified that he was in the area that evening because he had agreed to be his sister's designated driver. He testified that he stopped to talk to several people when the nightclub closed, so he was not with his sister. As he began walking back to her car, however, he realized he had to urinate and decided to look for a place to do so outside. He testified that he walked south on Summit Street, passed his sister's white Chrysler, and approached the southwest corner of the Summit Artspace building. As he did so, Mr. Coleman stated, he heard tires screech and saw between two and four cars speed past him down Summit Street. Mr. Coleman testified that he continued to walk south and, shortly thereafter, he heard gunshots.

{¶49} Mr. Coleman claimed he saw a man standing in front of Summit Artspace shooting a gun in the direction of his sister's car. He indicated that he had seen the man around before but could not recall his name or give any physical description of the man except for the fact that it was a man. Mr. Coleman claimed that he began to creep toward the shooter because he believed his sister was in danger and meant to intercede. The gunman eventually dropped the gun, however, and ran toward the parking lot across the street. It was Mr. Coleman's testimony that he chose to rush forward, pick up the gun, and clear it of any live rounds so that no one could be shot. The police began firing at him as he held the gun, however, so he ran south. He confirmed that he ran around the Summit Artspace building, scaled a chain link fence at the southeast corner of the building, and dropped the gun before turning north and running back out to East Market Street. The defense argued that Mr. Coleman's DNA was on the gun because he cleared the weapon and carried it for a length before dropping it. The defense also argued that Mr. Coleman had gunshot residue on his hands either because he handled the gun or because the police transferred residue onto his hands when they handcuffed him.

{¶50} Having carefully reviewed the record, this Court cannot conclude that the jury clearly lost its way and created a manifest miscarriage of justice when it found Mr. Coleman guilty of knowingly causing or attempting to cause physical harm to J.M. and C.O. by means of a deadly weapon. *See Otten*, 33 Ohio App.3d at 340; R.C. 2903.11(A)(2). The State's evidence tended to show that Mr. Coleman used an AK-47 to fire at least 29 rounds in the direction of Summit Street while standing near the front door of Summit Artspace. The State's evidence also tended to show that (1) at least three different cars were struck by that gunfire, (2) J.M. was shot in the arm as he was traveling south on Summit Street in a moving vehicle while shots erupted, and (3) C.O. sustained a gunshot wound to his foot in that same area around that same time after having been

involved in a car crash. While Mr. Coleman claimed not to have been the shooter, both Officers Siegferth and Antonucci saw the shooter wearing the same sweatshirt Mr. Coleman was wearing when they arrest him. The weight to be assigned to the evidence and the credibility of the witnesses were issues squarely within the province of the jury. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This Court has repeatedly held that "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses rather than the defendant's version of the events." *State v. Martinez*, 9th Dist. Wayne No. 12CA0054, 2013-Ohio-3189, ¶ 16. Because Mr. Coleman has not shown that this is the exceptional case where the evidence weighs heavily against his convictions, we reject his argument to the contrary. *See Otten* at 340. Thus, Mr. Coleman's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL[.]

{¶51} In his third assignment of error, Mr. Coleman argues that the trial court abused its discretion when it denied his motion for a new trial. We disagree.

{¶52} This Court reviews a trial court's decision to deny a motion for a new trial for an abuse of discretion. *State v. McQuistan*, 9th Dist. Medina No. 17CA0007-M, 2018-Ohio-539, ¶ 42. *See also State v. Davis*, 9th Dist. Lorain No. 12CA010256, 2013-Ohio-846, ¶ 6 (denial of motion for leave to file motion for new trial also reviewed for an abuse of discretion). An abuse of discretion indicates that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶53} Apart from motions based on newly discovered evidence, motions for a new trial must be filed "within fourteen days after the verdict was rendered * * * unless it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from filing his motion

* * *." Crim.R. 33(B). A defendant who seeks to file a motion for a new trial outside the timeframe provided by Crim R. 33(B) must first obtain leave of court. *State v. Baskerville*, 9th Dist. Summit No. 29327, 2019-Ohio-3639, ¶ 7. "In the absence of compliance with the procedures set forth in Crim.R. 33(B), a motion for a new trial is not properly before the trial court." *State v. Hernon*, 9th Dist. Medina Nos. 3262-M and 3267-M, 2002-Ohio-3741, ¶ 9. A trial court does not abuse its discretion by denying an untimely motion for a new trial when leave to file has not been sought. *Baskerville* at ¶ 8.

{¶54} One month after the jury returned its verdicts against him and while he was still represented by counsel, Mr. Coleman filed a pro se motion for acquittal and/or a new trial. The trial court addressed his motion at the start of the sentencing hearing. In doing so, the court noted that the motion was untimely and did not appear to have been properly served on the prosecutor. Although the court briefly discussed the contents of the motion at the hearing, the court wrote in its sentencing entry: "The Defendant's pro se motion for acquittal or for a new trial is DENIED. The pro se motion was not timely filed, nor was the Certificate of Service proper."

{¶55} Mr. Coleman argues that the trial court abused its discretion when it denied his motion for a new trial because it contained meritorious issues. While he acknowledges his motion was untimely, he claims "any time defect was waived by the trial court" because the court discussed issues raised in the motion at the sentencing hearing.

{¶56} While the trial court briefly addressed the contents of Mr. Coleman's motion at the sentencing hearing, the court indicated that it had only reviewed the motion to "[make] sure that it did not contain something that required immediate attention." The trial court specifically noted that the motion was untimely and expressly denied it on that basis in its written sentencing entry. "It is axiomatic that a court speaks through its journal entries." *State v. Jones*, 9th Dist. Lorain

No. 15CA010801, 2017-Ohio-1181, ¶ 7. Because Mr. Coleman's motion for a new trial was untimely and he did not seek leave of court, the trial court did not abuse its discretion by denying his motion on the grounds of untimeliness. *See Baskerville*, 2019-Ohio-3639, at ¶ 7; *Hernon*, 2002-Ohio-3741, at ¶ 9. Mr. Coleman's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

THE SENTENCE IMPOSED UPON APPELLANT IS BASED UPON A STATUTORY SCHEME THAT VIOLATES APPELLANT'S RIGHT TO DUE PROCESS OF LAW UNDER THE UNITED STATES AND OHIO CONSTITUTIONS[.]

{¶57} In his fourth assignment of error, Mr. Coleman argues that his due process rights were violated when he was sentenced under Reagan Tokes because that sentencing scheme is unconstitutional. He concedes that he did not challenge the constitutionality of Reagan Tokes in the lower court but urges us to reverse based on plain error. For the following reasons, this Court rejects his argument.

{¶58} "A party asserting that a statute is unconstitutional must prove that the statute is unconstitutional beyond a reasonable doubt." *State v. Smith*, 9th Dist. Wayne No. 15AP0001, 2017-Ohio-359, ¶ 28. "'The failure to challenge the constitutionality of a statute in the trial court forfeits all but plain error on appeal, and the burden of demonstrating plain error is on the party asserting it.'" *State v. Detamore*, 9th Dist. Wayne No. 15AP0026, 2016-Ohio-4682, ¶ 19, quoting *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, ¶ 2. Plain error only may be invoked where the following three elements exist:

> First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. * * * Third, the error must have affected "substantial rights" * * * [and] affected the outcome of the trial.

*State v. Consilio*, 9th Dist. Summit No. 28409, 2017-Ohio-7913, ¶ 7, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). There is a discretionary aspect of Crim.R. 52(B), and reviewing courts should take notice of plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶59} Mr. Coleman argues that Reagan Tokes is unconstitutional beyond a reasonable doubt because it violates an offender's "constitutionally protected liberty interest in being released from prison at the expiration of his minimum term." He relies on *State v. Sealey*, 8th Dist. Cuyahoga No. 109670, 2021-Ohio-1949, an Eighth District decision that found certain provisions of Reagan Tokes to be facially unconstitutional. While the trial court did not analyze the constitutionality of the sentencing scheme, Mr. Coleman asks this Court to conclude that the scheme offends the Due Process Clause, and thus, is unconstitutional on its face.

{¶60} Mr. Coleman has presented this Court with an extremely limited plain error argument on appeal. Though he cites the plain error standard, he has not developed his argument in the context of that standard. *See State v. Boatright*, 9th Dist. Summit No. 28101, 2017-Ohio-5794, ¶ 8; *M.H. v. J.P.*, 9th Dist. Lorain Nos. 15CA010832, 15CA010833, 2017-Ohio-33, ¶ 10. The only case he has cited to establish that error occurred, *State v. Sealey*, was non-binding authority at the time of its issuance and has since been overruled by the Eighth District sitting en banc. *See State v. Sealey*, 8th Dist. Cuyahoga No. 109670, 2022-Ohio-1166, citing *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470. He has failed to address any contrary authority[2] and, apart from several conclusory statements, has not explained why this is the

---

[2] We would note that, to date, every appellate district presented with a challenge to the constitutionality of Reagan Tokes has upheld the sentencing scheme as constitutional. *See State v. Joyce*, 11th Dist. Lake No. 2021-L-006, 2022-Ohio-3370; *State v. Drennen*, 4th Dist. Gallia No.

exceptional case where plain error must be found "to prevent a manifest miscarriage of justice." *Long* at paragraph three of the syllabus. This Court has yet to address the constitutionality of Reagan Tokes and is loath to do so based on the limited argument presented herein. Given the limited nature of Mr. Coleman's argument and the fact that he has not provided this Court with any authority in support of his position that an error occurred, we cannot conclude that he has met his burden of demonstrating plain error. *See Detamore* at ¶ 19, quoting *Quarterman* at ¶ 2. As such, his fourth assignment of error is overruled.

**ASSIGNMENT OF ERROR V**

APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL[.]

**{¶61}** In his fifth assignment of error, Mr. Coleman argues that he received ineffective assistance of counsel. We disagree.

**{¶62}** "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. To prove ineffective assistance of counsel, one must establish that: (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Prejudice exists if there is "a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 138. This Court need

---

21CA10, 2022-Ohio-3413; *State v. Woods*, 5th Dist. Stark No. 2021 CA 00132, 2022-Ohio-3339; *State v. Guyton*, 1st Dist. Hamilton No. C-190657, 2022-Ohio-2962; *State v. Maddox*, 6th Dist. Lucas No. L-19-1253, 2022-Ohio-1350; *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470; *State v. Hacker*, 3d Dist. Logan No. 8-20-01, 2020-Ohio-5048; *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837.

not address both prongs of the *Strickland* test if the appellant fails to satisfy either prong. *State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10.

{¶63} Mr. Coleman argues that he received ineffective assistance of trial counsel in four respects. Specifically, he argues that his trial counsel engaged in a deficient performance when he: (1) failed to argue that Reagan Tokes is unconstitutional; (2) failed to file a motion for a new trial; (3) impugned Mr. Coleman's character during closing argument; and (4) failed to pursue and draw attention to certain exculpatory evidence. This Court will address each of Mr. Coleman's arguments in turn.

The Constitutionality of Reagan Tokes

{¶64} Defense counsel did not challenge the constitutionality of Reagan Tokes in the lower court. Mr. Coleman notes that, during sentencing, the trial court specifically commented on the fact that the Eighth District had found the sentencing scheme unconstitutional while this District had yet to rule on that issue. In light of that dialogue, Mr. Coleman argues, it was objectively unreasonable for defense counsel not to challenge the constitutionality of Reagan Tokes. According to Mr. Coleman, "the fact that some courts have held the law to be unconstitutional, implies that a different outcome, at least in regard to his sentence in this case, was likely."

{¶65} Assuming without deciding that defense counsel engaged in deficient performance when he failed to challenge the constitutionality of Reagan Tokes, Mr. Coleman's prejudice argument is specious, at best. The Eighth District case the trial court referenced has since been vacated, *see State v. Sealey*, 8th Dist. Cuyahoga No. 109670, 2022-Ohio-1166, citing *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470, and was never binding authority in this District. Moreover, to date, every appellate district presented with a challenge to the

constitutionality of Reagan Tokes has upheld the sentencing scheme as constitutional. *See State v. Joyce*, 11th Dist. Lake No. 2021-L-006, 2022-Ohio-3370; *State v. Drennen*, 4th Dist. Gallia No. 21CA10, 2022-Ohio-3413; *State v. Woods*, 5th Dist. Stark No. 2021 CA 00132, 2022-Ohio-3339; *State v. Guyton*, 1st Dist. Hamilton No. C-190657, 2022-Ohio-2962; *State v. Maddox*, 6th Dist. Lucas No. L-19-1253, 2022-Ohio-1350; *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470; *State v. Hacker*, 3d Dist. Logan No. 8-20-01, 2020-Ohio-5048; *State v. Ferguson*, 2d Dist. Montgomery No. 28644, 2020-Ohio-4153; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837. Mr. Coleman's solitary statement that a different outcome "was likely" had his counsel challenged the constitutionality of the sentencing scheme is insufficient to demonstrate prejudice under *Strickland*. *See Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, at ¶ 138. Consequently, this Court rejects that aspect of his ineffective assistance of counsel argument.

<u>Motion for a New Trial</u>

**{¶66}** Next, Mr. Coleman argues that his trial counsel engaged in deficient performance when he failed to file a motion for a new trial. Mr. Coleman notes that he was forced to file a pro se motion and his counsel never argued the motion on his behalf. In setting forth the foregoing argument, however, Mr. Coleman has not specifically addressed the prejudice prong of *Strickland*. That is, he has not explained why there is a reasonable probability that, but for his counsel's failure to file a motion for a new trial, the outcome of his proceeding would have been different. *See id.* This Court will not formulate and then address an argument on Mr. Coleman's behalf. *See* App.R. 16(A)(7); *Cardone v. Cardone*, 9th Dist. Summit No. 18349, 1998 WL 224934, *8 (May 6, 1998). Assuming without deciding that it was objectively unreasonable for defense counsel to fail to file a motion for a new trial, Mr. Coleman has not demonstrated that he was prejudiced by that failure. As such, this Court rejects his argument to the contrary.

Comments During Closing Argument

**{¶67}** Mr. Coleman testified on his own behalf. During closing arguments, defense counsel said the following:

> [Mr. Coleman] got on the stand. Mr. Coleman said what he said.
>
> Was he a good testifier? Not really. A lousy testifier.
>
> He has an interest in this case, as much as anybody, more so, the most interest.

Defense counsel then went on to discuss how the police also had an interest in the case and how that interest colored the events that they believed had transpired. According to Mr. Coleman, he received ineffective assistance of counsel when defense counsel commented on the quality of his testimony and his interest in the case. He argues that his counsel's statements suggested to the jury that he was a bad witness who had offered biased testimony.

**{¶68}** It is well-settled that, "debatable trial tactics do not give rise to a claim for ineffective assistance of counsel." *State v. Hoehn*, 9th Dist. Medina No. 03CA0076-M, 2004-Ohio-1419, ¶ 45. That is because "[t]here are countless ways to provide effective assistance in any given case[,]" and "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight * * *." *Strickland* at 689. "Even if this Court questions trial counsel's strategic decisions, we must defer to his judgment." *State v. Herrington*, 9th Dist. Summit No. 25150, 2010-Ohio-6455, ¶ 9.

**{¶69}** The record reflects that, during sentencing, the trial court specifically asked defense counsel to address Mr. Coleman's concern that his character had been impugned during closing argument. Defense counsel explained that he had commented on Mr. Coleman's lack of proficiency at testifying to try to explain or downplay several arguments that had arisen between Mr. Coleman and the prosecutor while Mr. Coleman was being cross-examined. Thus, defense counsel's comment that Mr. Coleman was a "lousy testifier" was a matter of trial strategy. Further,

the record reflects that defense counsel remarked on Mr. Coleman's interest in the case immediately before he challenged the competing interests of the police officers who testified. The entire argument, when read in context, is indicative of a tactical decision to highlight certain realities about Mr. Coleman's interest in testifying to cause the jury to reflect on the interests and motivations of the State's testifying witnesses. Because defense counsel's arguments were strategic in nature, this Court cannot conclude that they give rise to a claim for ineffective assistance of counsel. *See Hoehn* at ¶ 45; *Herrington* at ¶ 9. We, therefore, reject Mr. Coleman's argument to the contrary.

Pursuing Exculpatory Evidence

**{¶70}** Finally, Mr. Coleman argues that he received ineffective assistance of counsel because his counsel did not pursue and draw attention to certain exculpatory evidence. It is undisputed that C.O., one of the victims in this matter, did not testify at trial. According to Mr. Coleman, C.O. was interviewed by the police and told them that the person who shot him was wearing a black hooded sweatshirt. Mr. Coleman notes that he was wearing a green hooded sweatshirt at the time of the shooting. Further, he notes that BCI detected the DNA of a second, unidentified male on swabs taken from the AK-47 the police found at the scene of the shooting. Mr. Coleman avers that C.O.'s statement to the police constituted exculpatory evidence, but defense counsel made no mention of that evidence at trial, gave no indication of any efforts to locate C.O., did not ask the State to detail its efforts to locate C.O., and did not request additional time to locate C.O. According to Mr. Coleman, C.O.'s statement, when combined with the presence of an unknown male's DNA on the gun, might have created reasonable doubt in the jury's mind about the identity of the shooter. Thus, he claims he was prejudiced by his counsel's failure to take steps to ensure C.O.'s statement was shared with the jury.

{¶71} "Allegations of ineffective assistance of counsel that rely on evidence outside of the record are impossible to resolve on direct appeal." *State v. Dukes*, 9th Dist. Summit No. 27966, 2019-Ohio-2893, ¶ 39. "This Court is confined to the record on appeal and may not engage in assumptions to sustain an ineffective assistance of counsel argument." *State v. Zeber*, 9th Dist. Summit No. 28481, 2017-Ohio-8987, ¶ 8, quoting *State v. Higgins*, 9th Dist. Summit No. 26120, 2012-Ohio-5650, ¶ 9. "[I]f 'allegations of the ineffectiveness of counsel are premised on evidence outside the record, * * * the proper mechanism for relief is through the post-conviction remedies of R.C. 2953.21, rather than through a direct appeal.'" *State v. Beaver*, 9th Dist. Medina No. 18CA0055-M, 2019-Ohio-3411, ¶ 5, quoting *State v. Sweeten*, 9th Dist. Lorain No. 07CA009106, 2007-Ohio-6547, ¶ 12.

{¶72} Because he did not testify at trial, the record contains little information about C.O. Sergeant Orrand did acknowledge on cross-examination that the police had interviewed C.O., but C.O.'s statement to the police is not a part of the record and Sergeant Orrand was not the officer who conducted that interview. The sergeant testified that C.O. was unwilling to answer his phone or open his door when the police later attempted to contact him. Any efforts on the part of defense counsel to track down C.O. also are not a part of the record. There was some discussion at the sentencing hearing about the probation department including certain statements made by C.O. in its pre-sentence investigation report. Both defense counsel and the trial court noted, however, that those statements had not come into evidence at trial. Further, the record does not contain a copy of Mr. Coleman's pre-sentence investigation report. Because C.O.'s statements to the police are not a part of the record and proof of any lack of diligence on the part of defense counsel would necessitate evidence outside the record, Mr. Coleman's final ineffective assistance claim cannot be resolved on direct appeal. *See Dukes* at ¶ 39. As such, his fifth assignment of error is overruled.

III.

**{¶73}** Mr. Coleman's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

CARR, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

ANGELA M. KILLE, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and JACQUENETTE S. CORGAN, Assistant Prosecuting Attorney, for Appellee.